IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on August 6, 2018[1]

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| v. | |
| AHMADREZA MOHAMMADI DOOSTDAR and | VIOLATIONS: |
| MAJID GHORBANI, | 18 U.S.C. § 371 (Conspiracy) |
| Defendants. | 18 U.S.C. § 951 (Acting as an Unregistered Agent of a Foreign Government) |
| | 50 U.S.C. §§ 1701-1706 (International Emergency Economic Powers Act) |
| | 31 C.F.C. Part 560 (Iranian Transactions and Sanctions Regulations) |
| | 18 U.S.C. § 2 (Aiding and Abetting) |

INDICTMENT

The grand jury charges that:

COUNT ONE
(Conspiracy)

At all times material to this Indictment:

1.  Defendant Ahmadreza Mohammadi DOOSTDAR (DOOSTDAR) was born in Long Beach, California, in or around 1980; DOOSTDAR is a United States Citizen.

---

[1] This grand jury was empaneled in the Superior Court of the District of Columbia and returned this indictment pursuant to its authority under D.C. Code § 11-1916(a).

DOOSTDAR left the United States in 1982 and moved to Canada and then to Tehran, Iran. DOOSTDAR has resided outside of the United States continuously since 1982, and prior to in or around 2017, DOOSTDAR was only known to have visited the United States briefly on two occasions.

2. Defendant Majid GHORBANI (GHORBANI) was born in or around 1959, and was raised in Iran. He first entered the United States in or about 1995. On or about May 28, 2015, GHORBANI became a Lawful Permanent Resident, or "green card holder," of the United States. He has lived and worked in Costa Mesa, California, since his arrival in the United States.

3. The Iranian Revolution, also known as the Islamic Revolution or the 1979 Revolution, refers to events involving the overthrow of Mohammad Reza Shah Pahlavi, who was supported by the United States, and the creation of an Islamic Republic under the Grand Ayatollah Ruhollah Khomeini.

4. The United States has no formal diplomatic relations with the government of the Islamic Republic of Iran (Iran or Government of Iran).

5. The People's Mujahedin of Iran, or Mojahedin-e Khalq (MEK), was created by a group of individuals who opposed the 1979 Revolution. Those individuals were exiled from Iran after the revolution, and they have advocated for the overthrow of the current regime since that time. The National Council of Resistance of Iran (NCRI) was created in 1981 to act as a political face for the MEK. The Government of Iran considers the MEK to be a primary opponent of its regime and has sought to eradicate the existence of the MEK.

6. The Government of Iran does not recognize Israel as a sovereign nation; it considers the Government of Israel to be an oppressor of the Palestinian people and an illegitimate occupier of Palestinian territory.

7. The present Government of Iran is hostile to Jewish interests throughout the world.

8. Hillel Houses and Chabad centers are examples of facilities dedicated to Jewish interests within the United States.

9. At no time did DOOSTDAR or GHORBANI notify the Attorney General, whose office in the Department of Justice is located in the District of Columbia, that he would and did act in the United States as an agent of a foreign government.

### The United States Sanctions Against Iran

10. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States, when the President declares a national emergency with respect to that threat.

11. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059, was in effect at all times relevant to this Indictment.

12. Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, sale, or supply, directly or indirectly, to Iran of, *inter alia*, any services from the United States or by a United States person.

The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

13. The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulation, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560, implementing the sanctions required by the Executive Orders.

14. Specifically, absent permission from OFAC in the form of a license, the ITSR prohibited the supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Iran or the Government of Iran (31 C.F.R. Part 560.204).

15. "U.S. Person" is defined to include U.S. citizens, or permanent resident aliens, or individuals located within the United States.

16. The ITSR were in effect.

17. At no time did DOOSTDAR or GHORBANI apply for a license from OFAC, which is located in the District of Columbia, to export services to Iran.

**The Conspiracy**

18. From in or around March 2017, up to and including August 9, 2018, in the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI did knowingly and unlawfully combine, confederate, and agree together, with each other, and with other persons, both known and unknown to the grand jury, to commit offenses against the United States, to wit,

Title 18, United States Code, Section 951, and Title 50, United States Code, Sections 1701 et seq.

## Objects of the Conspiracy

19. As a part of the conspiracy and as objects of the conspiracy, DOOSTDAR and GHORBANI did knowingly act as agents of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951, and did provide services to Iran, without having first obtained the required license from OFAC, as required by law, in violation of Title 50, United States Code, Sections 1701 et seq.

## Manner and Means of the Conspiracy

20. Beginning as early as March 2017, the Government of Iran would direct DOOSTDAR to travel to the United States in order to collect intelligence information about entities that are considered by the Government of Iran to be opponents of their regime, including the MEK and Israel.

21. Once in the United States, in July 2017, DOOSTDAR would recruit GHORBANI to act as an agent of the Government of Iran and would direct him to collect intelligence information about the entities listed above.

22. DOOSTDAR and GHORBANI would conduct surveillance on these entities within the United States.

23. DOOSTDAR and GHORBANI, working independently and together, would package and provide this information to the Government of Iran.

## Overt Acts

24.     In furtherance of the conspiracy and to effect the objects thereof, defendants DOOSTDAR and GHORBANI, and other unindicted co-conspirators, whose identities are known and unknown to the grand jury, did commit the following overt acts, in the District of Columbia, and elsewhere:

    a.     Beginning in or around March 2017, from Iran, DOOSTDAR conducted online research in order to plan a trip to Costa Mesa, California.

    b.     On or about July 19, 2017, DOOSTDAR traveled from Tehran, Iran, to Chicago, Illinois.

    c.     On or about July 19, 2017, in response to questions by U.S. Customs and Border Protection (CBP), DOOSTDAR stated he was visiting his brother in Chicago, Illinois, until approximately July 30, 2017, and he falsely stated that he intended to travel to Los Angeles, California, to visit his brother-in-law. DOOSTDAR also noted he intended to visit the Long Beach area where he was born.

    d.     On or about July 21, 2017, DOOSTDAR conducted physical surveillance of the Rohr Chabad Center, a Jewish center on the University of Chicago campus. DOOSTDAR also photographed the front and back of the Rohr Chabad Center, as well as the wrought iron fence surrounding the building.

    e.     On or about July 25, 2017, DOOSTDAR traveled from Chicago, Illinois, to Costa Mesa, California.

    f.     On or about July 26, 2017, DOOSTDAR met with GHORBANI at a Persian restaurant in Costa Mesa, California.

    g.     On or about July 26, 2017, after leaving the meeting, DOOSTDAR

6

conducted counter-surveillance activity by walking approximately one mile to a gas station in the opposite direction of his ultimate destination.

  h. On or about July 27, 2017, DOOSTDAR returned to the gas station, where GHORBANI picked him up in an automobile.

  i. On or about July 27, 2017, DOOSTDAR and GHORBANI met for approximately one hour in Costa Mesa, California.

  j. On or about July 27, 2017, GHORBANI drove DOOSTDAR back to a rental room, or Airbnb, where DOOSTDAR was staying during his activity in Costa Mesa, California.

  k. On or about July 29, 2017, GHORBANI picked DOOSTDAR up in a car at DOOSTDAR's Airbnb rental.

  l. On or about July 29, 2017, GHORBANI and DOOSTDAR met again for approximately one hour in Costa Mesa, California.

  m. On or about July 29, 2017, GHORBANI drove DOOSTDAR back to DOOSTDAR's Airbnb and handed DOOSTDAR a shopping bag from a department store.

  n. On or about July 30, 2017, DOOSTDAR departed the United States via air to return to Iran.

  o. On or about September 19, 2017, from Iran, DOOSTDAR reserved another Airbnb in Costa Mesa, California, for December 9-13, 2017. DOOSTDAR also reserved airline tickets from Tehran, Iran, to Chicago, Illinois, arriving on December 5, 2017; from Chicago, Illinois, to Los Angeles, California, arriving on December 9, 2017; and from Los Angeles, California, to Tehran, Iran, departing on December 13, 2017.

p. On or about September 20, 2017, at the direction of DOOSTDAR, GHORBANI attended a rally, organized by the MEK/NCRI in New York, New York, at which the Iranian regime was denounced.

q. On or about September 20, 2017, during this rally, GHORBANI conducted physical surveillance and photographed individuals participating in the rally.

r. On or about December 4-5, 2017, DOOSTDAR traveled from Iran to O'Hare International Airport in Chicago, Illinois.

s. On or about December 5, 2017, DOOSTDAR had in his possession $6,000 cash, a notebook, and two flash drives, one of which was concealed in a toy on a key chain.

t. On or about December 5, 2017, when interviewed by CBP officials at O'Hare International Airport, DOOSTDAR falsely reported that he did not visit any friends, family, or contacts in California in July 2017. He further falsely reported that he did not have any friends, family, or contacts in California whom he was planning to visit on the December 2017 trip.

u. On or about December 9, 2017, DOOSTDAR again traveled from Chicago, Illinois, to Costa Mesa, California.

v. On or about December 10, 2017, DOOSTDAR called GHORBANI from a pay phone outside a department store and identified himself as "Amir Mohajir." When GHORBANI responded that he did not know who was calling, DOOSTDAR then exclaimed, "you are Uncle Sohrab!" The two men thereafter immediately agreed to meet at approximately 1:00 p.m., near the Airbnb location where DOOSTDAR had stayed in July 2017.

8

w.  On or about December 10, 2017, GHORBANI picked DOOSTDAR up in an automobile at the agreed location.

x.  On or about December 10, 2017, in the car, GHORBANI stated to DOOSTDAR that he taken photographs and collected information from the September 20, 2017 MEK rally.

y.  In response, DOOSTDAR provided GHORBANI with a flash drive upon which he could copy the information, instructing GHORBANI to save the information in a "scattered" format. GHORBANI replied that he only had "10-12 photos," and DOOSTDAR responded that this was good, and just to "explain what those are."

z.  On or about December 10, 2017, while describing an individual affiliated with MEK, GHORBANI told DOOSTDAR that "motherfucker is . . . working for Mossad now . . . he works for these people too . . . he gets paid; he is one of those motherfucking Jews . . . I swear; motherfucker needs one – one shot."

aa.  On or about December 10, 2017, GHORBANI informed DOOSTDAR that GHORBANI would be traveling to Iran in March 2018 where he would provide an in-person briefing about the people involved with the September 20, 2017 MEK rally.

bb.  On or about December 10, 2017, DOOSTDAR told GHORBANI that certain individuals would be available to meet with GHORBANI in Iran.

cc.  On or about December 10, 2017, DOOSTDAR cautioned GHORBANI not to try to call Iran directly because there would be no way to set up a secure line.

dd.  On or about December 10, 2017, GHORBANI printed photographs at a drug store that were placed into an orange and white photograph envelope. GHORBANI

9

also copied the photographs onto the flash drive that had been concealed in the toy on the keychain that was in DOOSTDAR's possession when he entered the United States.

ee. On or about December 11, 2017, GHORBANI and DOOSTDAR met outside a coffee shop in Costa Mesa, California, for approximately 45 minutes.

ff. During this meeting, on or about December 11, 2017, DOOSTDAR took notes and left carrying the orange and white photograph envelope and the keychain containing the flash drive.

gg. On or about December 12, 2017, while DOOSTDAR was awaiting his outbound flight at Los Angeles International Airport en route to Iran, DOOSTDAR carried within his hand-carry luggage a signed, hand-written payment receipt stating, "I, Uncle Sohrab, received $2,000."

hh. On or about December 12, 2017, as DOOSTDAR was awaiting his outbound fight at Los Angeles International Airport en route to Iran, DOOSTDAR transported within his checked luggage the orange and white photo envelope, which was wrapped in a pair of boxer short-style underwear. That envelope contained 28 photographs from the September 20, 2017 MEK rally which GHORBANI had attended. Many of the photographs contained hand-written notes on the back which listed the identities and positions of the individuals depicted.

ii. On or about March 27, 2018, GHORBANI traveled to Iran. He took with him a manila envelope containing biographical and personal identifying information about several U.S. Congressmen with ties to the MEK.

jj. On or about April 17, 2018, GHORBANI returned to the United States. At the time of his return, he had in his possession hand-written notes containing

DOOSTDAR's Iran-based mobile phone number and taskings to collect additional intelligence on individuals associated with the MEK.

kk. On or about May 4, 2018, at DOOSTDAR's direction, GHORBANI traveled from Los Angeles, California, to Washington, D.C., to attend a conference at which the current Iranian regime was to be denounced.

ll. On or about May 4, 2018, GHORBANI attended the MEK-sponsored 2018 Iran Freedom Convention for Human Rights at the Grand Hyatt Hotel in Washington, D.C., at which he filmed and/or photographed conference speakers and attendees.

mm. On or about May 6, 2018, GHORBANI returned to California.

nn. On or about May 14, 2018, DOOSTDAR called GHORBANI to discuss the clandestine methods GHORBANI should use to provide the intelligence information to Iran that he had collected at the MEK conference in Washington, D.C.

oo. On or about July 19, 2018, DOOSTDAR traveled from Tehran, Iran, to Chicago, Illinois.

pp. On or about July 19, 2018, DOOSTDAR entered the United States carrying $16,000 in cash.

qq. From in or around March 2017 through on or about August 9, 2018, at no time did DOOSTDAR or GHORBANI notify the Attorney General, whose office at the Department of Justice is located in the District of Columbia, that he would and did act in the United States as an agent of a foreign government.

 rr. From in or around March 2017 through on or about August 9, 2018, at no time did DOOSTDAR or GHORBANI apply for a license from OFAC, which is located in the District of Columbia, to export services to Iran.

**(Conspiracy,** in violation of Title 18, United States Code, Section 371)

## COUNT TWO
**(Acting As an Unregistered Agent of a Foreign Government)**

25. The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Seventeen of this Indictment.

26. From in or around March 2017, up to and including the August 9, 2018, in the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, did knowingly act in the United States as agents of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951.

**(Acting as an Unregistered Agent of a Foreign Government** in violation of Title 18, United States Code, Section 951)

## COUNT THREE
### (International Emergency Economic Powers Act)

27. The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Seventeen of this Indictment.

28. In or around July 2017, within the District of Columbia, Iran, and elsewhere, DOOSTDAR, a United States Person, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the ITSR, by providing services to Iran, by collecting targeting information about two Jewish centers at the University of Chicago, without having first obtained the required license from OFAC.

**(IEEPA,** in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

## COUNT FOUR
### (International Emergency Economic Powers Act)

29. The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Seventeen of this Indictment.

30. In or around September 2017, within the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, United States Persons, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the ITSR, by providing services to Iran, by collecting targeting information about the MEK at a rally in New York, New York, without having first obtained the required license from OFAC.

**(IEEPA,** in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

## COUNT FIVE
### (International Emergency Economic Powers Act)

31. The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Seventeen of this Indictment.

32. In or around December 2017, within the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, United States Persons, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the ITSR, by providing services to Iran, by packaging and providing targeting information about the MEK to the Government of Iran, without having first obtained the required license from OFAC.

(**IEEPA,** in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

## COUNT SIX
### (International Emergency Economic Powers Act)

33. The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Seventeen of this Indictment.

34. In or around May 2018, within the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, United States Persons, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the ITSR, by providing services to Iran, by collecting targeting information about the MEK at a rally in Washington, D.C., without having first obtained the required license from OFAC.

(IEEPA, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

A TRUE BILL

FOREPERSON

*[signature]* // DHC
Attorney of the United States in
and for the District of Columbia