**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 18-255 (PLF)** |
| | : | |
| **AHMADREZA DOOSTDAR and** | : | |
| **MAJID GHORBANI,** | : | |
| | : | |
| **Defendants.** | : | |


**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits this Memorandum in Aid of Sentencing. Based on similar and

overlapping facts, Defendant Ahmadreza Doostdar (Doostdar) has pled guilty to Counts One and

Two of the Superseding Indictment, charging him with Conspiracy to Act as an Agent of a Foreign

Government, in violation of 18 U.S.C. § 371; and Acting as an Agent of a Foreign Government,

in violation of 18 U.S.C. § 951, and Defendant Majid Ghorbani (Ghorbani) has pled guilty to

Count Five of the Superseding Indictment, charging him with willfully violating the International

Emergency Economic Powers Act (IEEPA), in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts

560.204 & 560.206. As detailed below, the government recommends sentences of at or near the

high end of a 57-71-month range and a $16,000 fine for Doostdar and at or near the high end of

the applicable U.S. Sentencing Guidelines (Guidelines) range (46-57 months) and a $5,000 fine

for Ghorbani. The government believes that such sentences would be "sufficient, but not greater

than necessary, to comply with' the purposes of federal sentencing, in light of the [United States

Sentencing] Guidelines [U.S.S.G. or Guidelines] and other § 3553(a) factors." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (citing 18 U.S.C. § 3553(a)).[1]

## PROCEDURAL HISTORY

On August 8, 2018, Doostdar and Ghorbani were charged by criminal complaint with conspiring to: (1) willfully and knowingly act in the United States as agents of a foreign government, specifically the government of Iran, without first having notified the Attorney General, as required by law; and (2) provide services to Iran, without first having obtained the required license from the Office of Foreign Assets Control (OFAC), as required by law, in violation of 18 U.S.C. §§ 371 and 951 and 50 U.S.C. § 1705, *et seq*. On August 20, 2018, a grand jury returned an indictment charging the defendants with: one count of Conspiracy, in violation of 18 U.S.C. § 371 (Count One); one count of Acting as an Agent of a Foreign Government Without Notifying the Attorney General, in violation of 18 U.S.C. § 951 (Count Two); and two counts of willful violations of the International Emergency Economic Powers Act (IEEPA), in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts 560.204 and 560.206 (Counts Four and Five). The indictment also charged Doostdar with an additional count of willful violations of IEEPA, in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts 560.204 and 560.206 (Count Three). The grand jury returned a superseding indictment on August 15, 2019, with additional overt acts alleged but no new charges.

On October 8, 2019, Doostdar entered guilty pleas to Counts One and Two of the Superseding Indictment. On November 4, 2019, Ghorbani entered a guilty plea to Count Five of

---

[1]     Attached to this Memorandum are: (1) a Declaration of Robert Anderson, Jr. (Anderson Declaration), a government expert in this case, at Attachment 1; and (2) eight additional attachments consisting of evidence collected in the investigation at Attachments 2 to 9, which will be submitted to the Court under seal.

the Superseding Indictment. Sentencing for Ghorbani will be held on January 15, 2020, at 10:00 a.m., and for Doostdar on January 15, 2020, at 2:00 p.m.

## FACTUAL SUMMARY

Beginning at least as early as July 2017, and continuing up to and including August 8, 2018, the defendants acted on behalf of the Islamic Republic of Iran (Iran)[2] within the United States in order to collect information about individuals within the United States that, the government submits, would permit intelligence officers to Iran to create targeting packages for future operational activities. The defendants surveilled the constitutionally-protected activities of individuals who were members of organizations or groups in the United States to whom the Iranian regime is hostile, including the Mujahadeen-e-Khalq (MEK). The defendants, working individually and jointly, assembled surveillance materials, including photographs and other personal-identifying information, such as telephone numbers and addresses, and provided them to the government of Iran. As indicated by former Assistant Director of the Counterintelligence Division of the Federal Bureau of Investigation (FBI) Robert Anderson, such information is of "tremendous intelligence value." Anderson Declaration at 9.

### A.    In July 2017, Doostdar Traveled to the United States to Meet With and Recruit Ghorbani.

The scheme began at least as early as July 2017, when Doostdar traveled from Iran, via Chicago, Illinois, to Costa Mesa, California. On July 26, 2017, he met with Ghorbani at a Persian

---

[2]     The government of Iran is a foreign power with which the United States has no formal diplomatic relations. The U.S. Secretary of State has named Iran a state sponsor of terrorism every year since 1984; Iran is one of only three countries to be so named. Although Ghorbani has not admitted that he willfully provided services to the government of Iran, the government submits that the record, including Doostdar's guilty plea and related Statement of Offense, establishes by a preponderance of the evidence that, in fact, both defendants' services were on behalf of and for the benefit of the government of Iran.

restaurant there, where Ghorbani was employed. Agents who surveilled the meeting noted that, based on the way Ghorbani and Doostdar greeted each other, it appeared as if they were meeting for the first time. According to FBI surveillance, Doostdar was near the Persian restaurant the day before, shortly after his arrival in Costa Mesa. Doostdar was observed walking behind the restaurant, where he met with Ghorbani. When Doostdar stepped away from Ghorbani, Ghorbani had what appeared to be a standard 8.5x11-inch white piece of paper folded in half. Ghorbani folded the paper again and put it in his pocket. After leaving the meeting, Doostdar began walking back in the direction of his rental apartment, but then turned around and walked approximately one mile in the opposite direction to a gas station. Doostdar bought a drink, crossed the street, and began walking up a block before turning around again to enter another gas station across the street from the first one. He bought a second drink and was later seen walking toward his rental apartment. The FBI assesses that the purpose of this activity was likely twofold: Doostdar was conducting a surveilliance detection route (SDR), *see* Anderson Declaration at 5, after the first meeting, and he was conducting a pre-operational survey of the next meeting location. The next day, Doostdar met with Ghorbani at one of the two gas stations he visited on July 26, 2017.

At a second meeting, the pair drove to a market in Irvine, California, but initially drove past the market for several miles before turning around and returning to the market. As explained in the attached declaration of expert Robert Anderson, Jr., the use of such SDRs is consistent with conducting surveillance and counter-surveillance. *See* Anderson Declaration at 5-7. Agents also observed Doostdar changing clothes before each meeting, visiting meeting locations prior to the actual meeting, and arriving and departing from meetings in a circuitous manner—all examples of intelligence tradecraft. *See id.* at 9. FBI physical surveillance also noted that Doostdar walked slowly and was constantly scrutinizing his surroundings. He also appeared to look in reflections

from car and store windows as he passed by, consistent with checking for surveillance. *See id.* at 6-7. After meeting with Ghorbani multiple times over the next few days, Doostdar returned to Iran on July 30, 2017.

While Doostdar was present in the United States in July 2017, he communicated with his government of Iran handler using a "cut-out," identified as Co-conspirator A in the superseding Indictment. As described in the attached expert declaration, a "cut-out" permits an intelligence asset to plausibly deny that he or she is communicating with a foreign intelligence officer while in another country. *Id.* at 7. In at least some of the communications, the participants used coded language (for instance, referring to the meetings between Doostdar and Ghorbani as "games," and referring to Doostdar as the "coach"). During the communications, Co-conspirator A referred to Doostdar as "Amir." *See id.* at 7-8; *see also* Attachment 2 at 4, 6, 10-11, 17.

The communications corroborate that the defendants were acting under the direction and control of the government of Iran. For example, these communications show the following facts, among others:

- The government of Iran handler directed Doostdar to contact Ghorbani and provided Doostdar with Ghorbani's name and identifying information. Attachment 2 at 6.

- According to these communications, Ghorbani had a prior "coach" who was directing Ghorbani's activities for some period of time before July 2017. *Id.* at 7.

- During the July 2017 meetings, Doostdar served as Ghorbani's "coach;" it was his job to befriend Ghorbani and to gain Ghorbani's trust after a previous "coach" had said the "game" was canceled. *Id.* at 7-8.

- Doostdar indicated that Ghorbani's nickname should be 'Uncle Sohrab." *Id.* at 15.

- The government of Iran handler directed Doostdar that neither he nor Ghorbani should bring a cell phone to their next planned meeting and that Doostdar and Ghorbani should communicate via a "clean line.'" *Id.* at 12.

- The handler directed Doostdar's payments to Ghorbani, stating in code that Doostdar should pay Ghorbani $3,000 if he agreed to "continue."[3] *Id*. at 10.

- Doostdar obtained a receipt from Ghorbani (presumably for this payment). *Id*. at 18.

- The handler directed Doostdar to give Ghorbani a specified phone number in Iran that Ghorbani was to use to call a government of Iran point of contact. *Id*.

Doostdar relayed to Co-conspirator A that Ghorbani had told Doostdar that Ghorbani was "very happy with the new plan, and also the new contact number that was given to him" and that Ghorbani was "very energetic and he will come and bring a lot of things during Eid." *Id*.

### B.   In September 2017, Ghorbani Attended an MEK Rally in New York City.

On September 20, 2017, Ghorbani attended a rally in New York City organized by the MEK, conducted physical surveillance, and photographed individuals participating in the rally. MEK, also referred to as the People's Mujahedin of Iran, was created by a group of individuals who opposed the 1979 Iranian revolution. Those individuals were exiled from Iran after the revolution, and they have continuously advocated for the overthrow of the current regime since that time.[4] The National Council of Resistance of Iran (NCRI) was created in 1981 to act as a political front for the MEK. The government of Iran considers the MEK to be a primary opponent of the current regime and has sought to eradicate the MEK.[5]

---

[3]     In his post arrest interview, Doostdar admitted to paying Ghorbani $3,000 at one of the July 2017 meetings.

[4]     The group was once listed by the United States as a Foreign Terrorist Organization but was delisted in 2012.

[5]     The oppositional relationship between the Government of Iran and MEK is unique. The government of Iran considers MEK/NCRI to be a primary opponent of the current Iranian regime. Since MEK went into exile at the time of the Revolution, the Government of Iran has attacked MEK on multiple occasions. Throughout the 1990s, there was a proactive campaign of

**C.     In December 2017, Doostdar Returned to the United States and Collected Photographs Taken by Ghorbani at the New York MEK Rally.**

On or about December 4–5, 2017, Doostdar again flew from Iran to the United States. As he had done before, Doostdar first flew to Chicago. During a court-authorized physical search upon his arrival in Chicago, Doostdar had in his possession $6,000 in cash, a notebook, and two flash drives—one of which was concealed in a toy on a keychain. Doostdar told Customs and Border Protection (CBP) officers at O'Hare International Airport that the $6,000 cash was to pay his brother back for all of his expenses. Additionally, he falsely reported that he did not visit any friends, family, or contacts in California during his visit in July 2017 and that he did not have any friends, family, or contacts in California that he was planning to see on his December trip. On December 9, 2017, Doostdar again traveled from Chicago to Costa Mesa, California.

On December 10, 2017, Doostdar called Ghorbani from a pay phone outside a department store in California and identified himself as "Amir Mohajir;" Ghorbani stated he did not know who was calling. Then Doostdar exclaimed "you are Uncle Sohrab!" *See* Attachment 3 at 2-3. This comment appears to have oriented Ghorbani and, thereafter, the two men agreed to meet. *Id.* That meeting occurred in a vehicle driven by Ghorbani with Doostdar sitting in the rear passenger seat. Ghorbani also made numerous last-minute turns and U-turns, consistent with conducting counter-surveillance and surveillance detection techniques. *See* Anderson Declaration at 9.

---

assassination by the government of Iran against MEK leaders residing abroad through agents and officers of the Iranian intelligence services. In 2015, Shia-a militia groups associated with the Iranian Revolutionary Guard Corps (IRGC) launched missile attacks on Camp Liberty and Camp Ashraf in Iraq, which housed thousands of MEK members; in 2017, IRGC acknowledged responsibility for these attacks. In June 2018, European security services arrested four people including an Iranian diplomat in connection with a plot to detonate an explosive device at an MEK conference in Paris. *See* Anderson Declaration at 2-3.

During the meeting, Ghorbani stated that he had taken photographs and collected information at the September 20, 2017, MEK rally. Ghorbani described his trip to New York to attend the MEK rally, stating, "I went to their meeting in New York . . . saw no other option . . . you have to go, if you want to penetrate– you have to go . . . I went to their event and took a lot of photos." Attachment 4 at 5. Doostdar asked for this information and Ghorbani replied it was not complete. Ghorbani went on to say, "I took some pictures and collected some information of them and some senators that they worked with . . . . I have prepared a package, but it is not complete . . . ." *Id.* Doostdar asked Ghorbani to give him what he had collected to date.

Doostdar gave Ghorbani a "flash," likely a reference to a flash/USB drive, stating, "they said, don't give us those things printed, give us the file format, prints wear off after a while because we work and zoom in on those materials." *Id.* at 3. Doostdar instructed Ghorbani to "save it on this. I have something– personal photos and movies– saved on this, you save your on this in scattered format– whatever you have . . . I noticed they don't search these at all, I put it right in front of them, they didn't even open it– upon departure is easier, when you leave then they don't even bother you." *Id.* In response, Ghorbani replied he had only 10–12 photos and Doostdar responded that was "good enough for now" and to just "explain what those are." *Id.* Ghorbani, expressing frustration, replied, "I don't like it this way . . . I like to have a complete package, meaning that there is no gap in information." *Id.* at 5.

During the car ride, Ghorbani also described that he had learned how many agents the MEK had in Iran. He reported that he saw the individual who "leaked the nuclear program in 2001 . . . with [name redacted 1], who is the head of the National Resistance Council here – with [name redacted 2]." *Id.* at 4. Ghorbani went on to discuss a U.S. Senator he had videotaped at the conference, noting the "[expletive] is working for Mossad now . . . he works for these people too

. . . he gets paid; he is one of those [expletive] Jews . . . I swear; [expletive] needs one- one shot." *Id.* at 5. Doostdar laughed throughout this exchange.

The pair then discussed how and when to meet again. Ghorbani asked if he could call Doostdar back on the "same one you called me from?" *Id.* Doostdar replied, "No, I call you from public phone . . . from Macy's public phone." *Id.* Doostdar then offered to set up the next meeting "right now" and they agreed to meet the following day. *Id.* Ghorbani also informed Doostdar that he would be traveling to Iran in March 2018 where he would provide an in-person briefing about the people involved in the September 20, 2017 MEK rally. Doostdar cautioned Ghorbani not to try to call Iran directly, despite Ghorbani previously having called Iran and asking about a "secure line." Doostdar indicated to Ghorbani that "they" said do not contact them from the United States at all. *Id.* at 3.

Ghorbani then went to a drugstore and printed photographs that he placed in an orange and white envelope. Court-authorized electronic surveillance revealed that Ghorbani called a friend for assistance in transferring photos to the flash drive. He then copied the photographs onto the flash drive concealed in a toy on the keychain that was in Doostdar's possession when he entered the United States. During another car ride the next day, on December 11, 2017, Ghorbani assured Doostdar that his phone was off, but Doostdar nonetheless stated that they should wait until they got out of the car to talk since phones could record "even if they are turned off." Attachment 5 at 7. Ghorbani and Doostdar then went to a coffee shop in Costa Mesa, California. During this meeting, Doostdar took notes and left carrying the orange and white envelope and the keychain containing the flash drive concealed in a toy on the keychain.

The next day, while in Los Angeles airport waiting for his outbound flight to Iran, a search of Doostdar's luggage revealed a notebook which contained a signed, hand-written payment

receipt stating, "I, Uncle Sohrab, received $2,000." *See* Attachment 6 at 220. "Sohrab," as noted above, was the alias being used by Ghorbani. The FBI also found approximately $2,400 in U.S. currency in his luggage. *Id.* at 238. As previously noted, Doostdar brought $6,000 into the country earlier in December. The search also revealed an orange and white envelope, wrapped in a pair of underwear, with 28 photographs from the September 20, 2017 MEK rally that Ghorbani had attended. *Id.* at 245-65. Many of the photographs contained hand-written notes on the back that listed the identities and positions of the individuals depicted. Some of the pictures are of Ghorbani standing next to select individuals at the rally, while others appear to have been taken more surreptitiously. The FBI also recovered a flash/USB drive concealed within a toy on a key chain located in a wallet in Doostdar's checked luggage. *Id.* at 266.

**D.     In May 2018, Ghorbani Traveled to Iran After Collecting Information on MEK Members and Returned to the United States With Taskings.**

On March 14, 2018, FBI agents conducted a court-authorized physical search of Ghorbani's apartment and found several hand-written notes in Farsi regarding members of the MEK, including names, positions, and relations to other MEK members. Some of the notes referenced MEK meetings that Ghorbani allegedly attended at the Persian restaurant, such as one on August 1, 2017, where they discussed several topics, including sending three U.S. Senators to visit the MEK's base in Albania, planning a demonstration in New York on September 20, 2017, in front of the United Nations at the time of Iranian President Hassan Rouhani's arrival, and reviewing Congress's decision regarding designating the Islamic Revolutionary Guard Corps as terrorists. Agents also found, in a locked suitcase, a manila envelope containing biographical data and phone numbers about several government officials who have voiced public support for MEK.

On March 27, 2018, Ghorbani traveled to Iran. On April 17, 2018, Ghorbani returned to the United States and had in his possession hand-written notes containing Doostdar's Iran-based

mobile phone number and a document which appeared to contain a list of taskings to collect additional intelligence on individuals associated with the MEK. The document was titled "About the organization" and included in the list:

- More influence in order to find out secret information, people in the network and organization's decisions against Islamic Republic;

- Attending the monthly gathering every last Sunday of the month at the church;

- Evaluation of the work place's independency and the possibility of using it for the gathering of the important people of the organization; and

- Introducing a second person who can be trained by uncle Sohrab and can act like uncle Sohrab inside the organization. (*See* Attachment 7).

### E.    Ghorbani Attended an MEK Convention in Washington, D.C.

On April 23, 2018, according to court-authorized electronic surveillance, a known anti-Iranian regime dissident invited Ghorbani to attend an MEK rally in Washington, D.C. When Ghorbani expressed concerns about the timeframe of the travel, the dissident began talking to him about traveling to Paris instead. Later that same day, according to court-authorized electronic surveillance of Ghorbani's mobile phone, he received additional calls about attending the MEK rally, including one in which an unidentified male offered to book a flight for him to Washington, D.C.

On May 4, 2018, Ghorbani traveled from Los Angeles, California, to Washington, D.C., and attended the MEK-sponsored 2018 Iran Freedom Convention for Human Rights at the Grand Hyatt Hotel in Washington, D.C. The convention was organized by the Organization of Iranian American Communities (OIAC), which is supportive of the MEK, and featured speakers who are members and supporters of the MEK. The convention featured Iranians who support a free and democratic Iran consistent with the ten-point plan of Maryam Rajavi, President-elect of the NCRI. Rajavi spoke to the convention via a video message. At the convention, Ghorbani filmed and

photographed conference speakers and attendees. OIAC uploaded a video to YouTube on or about May 6, 2018, of Rudy Giuliani's speech at the convention. The video featured occasional cuts toward the crowd, and in several instances, Ghorbani is visible sitting among the California delegation. In every instance, he can be seen lifting up his smartphone and pointing its lens at the speech, speaker, and/or attendees. *See* Attachment 8.

On May 14, 2018, Doostdar called Ghorbani and asked him to send information with someone he trusts and stressed that Ghorbani should not mail it. *See* Attachment 9 at 1210. Ghorbani responded that he was not able to do so and asked Doostdar whether they could discuss it during their call. *Id.* Doostdar refused to speak to Ghorbani on an open phone line. *Id.*

**F.      In July 2018, Doostdar Returned to United States; Both Defendants Were Arrested in August 2018.**

Doostdar returned to the United States from Iran on July 19, 2018, carrying approximately $16,000 in cash and several electronic items. Doostdar was arrested in Chicago, Illinois, on August 9, 2018. Prior to his arrest, he had made arrangements to travel from Chicago, Illinois, to Los Angeles, California, presumably to collect from Ghorbani the information Ghorbani had gathered at the MEK-sponsored 2018 Iran Freedom Convention for Human Rights.

Ghorbani's use of the codename "Uncle Sohrab" was demonstrated during his arrest. Ghorbani was arrested in Costa Mesa, California, on August 9, 2018. Shortly before he was arrested, Ghorbani was approached by an FBI undercover employee (UCE), who claimed that he had been sent by "Amir Mohajir." The UCE asked whether Ghorbani was "Uncle Sohrab," and Ghorbani nodded yes. The UCE told Ghorbani that he was traveling to Iran the next day, and that "Amir" had asked the UCE to bring Ghorbani's "documents" to Iran. Ghorbani responded that he did not know or recognize the UCE and asked the UCE to have "Amir" (*i.e.*, Doostdar) contact him again by phone after 5 p.m.

12

**G.      Defendants Have Failed to Comply with U.S. Laws on Licensing and Notification.**

At no time did Ghorbani apply for a license from the Office of Foreign Assets Control (OFAC), which is located in the District of Columbia, to supply services, directly or indirectly, to Iran or to the government of Iran. At no time did Doostdar notify the Attorney General of the United States, whose office in the Department of Justice is located in the District of Columbia, that he or Ghorbani was acting as an agent of the government of Iran within the United States.

Ghorbani's failure to apply for a license from OFAC prevented the U.S. government from determining whether and on what terms it would allow Ghorbani to provide his services to Iran. It also prevented the FBI from, for example, being able to alert the MEK supporters Ghorbani was surveilling of his true intent. Had the MEK supporters and activists known that Ghorbani was attending their gatherings in order to conduct physical surveillance and provide photographs and other information regarding MEK members to persons in Iran, it is likely they would not have allowed him to attend their gatherings, let alone paid for his airfare. Indeed, some MEK members believe they would be killed by the government of Iran if they were to travel to Iran and if Ghorbani had provided their information to the government of Iran.

Meanwhile, while Doostdar hid items from, and provided false information to, CBP officers, he was acting at the direction of the government of Iran. While he was in the United States, he was fully aware that he reported to the government of Iran and that his actions were ultimately for the benefit of that foreign government. By failing to disclose his direction by the government of Iran, Doostdar attempted to operate at the government of Iran's direction and control and advance its agenda and goals without any scrutiny by the U.S. government. These actions frustrate the purposes of Section 951—and as explained below, potentially endangered the lives of U.S. citizens.

13

## SENTENCING RECOMMENDATION AND ANALYSIS[6]

The government recommends that the Court sentence Ghorbani to at or near the high end of the applicable Guideline range of 46-57 months, as well as a $5,000 fine, which is below the applicable Guideline range. *See* Presentence Investigation Report (PSR) for Ghorbani (Ghorbani PSR) (ECF No. 94) at ¶¶ 10, 74 & 94. The Probation Officer has not identified any circumstances that are not adequately considered within the Guidelines. *See id.* at ¶ 96.[7] As discussed below, the Sentencing Guidelines should be the starting point for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The government submits that a sentence of at or near the high end of the applicable Guideline range and a $5,000 fine also would comply with the purposes of federal sentencing laws as provided in 18 U.S.C. § 3553(a).

The government recommends that the Court sentence Doostdar to at or near the high end of a 57-71-month range, which is the Guideline range that would be applicable if the Court were to use the same Guideline range as for Ghorbani and then apply a two-level adjustment for aggravating role pursuant to U.S.S.G. § 3B1.1, as well as a $16,000 fine. *See* PSR for Doostdar (Doostdar PSR) (ECF No. 87) at ¶ 26. Doostdar recruited, tasked, paid, and supervised the activities of Ghorbani, and Doostdar is therefore deserving of the equivalent of a two-point enhancement under U.S.S.G. § 3B1.1(c).

---

[6]   As discussed below, the government believes that Doostdar is the more culpable defendant of the two. However, his primary offense of conviction does not have an analogous Guideline range. By contrast, Ghorbani pled guilty to a crime that does have an associated Guideline range. For this reason, the government has elected to argue the appropriate sentence for Ghorbani first in this section.

[7]   The PSR notes, "The D.C. Circuit has ruled that a downward departure may be appropriate if the defendant's status as a deportable alien is likely to cause fortuitous increase in the severity of confinement." *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994). *Id.* at ¶ 100. As discussed below, the government does not believe such a departure is appropriate in this case.

A comparison of sentences meted out in comparable cases further supports the government's recommendations, showing that the requested sentences are well within the range of similar sentences imposed for similar conduct.

### A.    Legal Standards

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman*, 564 U.S. at 529 (citing 18 U.S.C. § 3553(a)). When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1) and (2). Furthermore, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the Guidelines are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall*, 552 U.S. at 49. The Supreme Court has "recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338,

350 (2007)). As one member of this Court has held, "*Booker* requires judges to engage in a two-step analysis to determine a reasonable sentence." *United States v. Doe*, 413 F.Supp.2d 87, 90 (D.D.C. 2006) (Bates, J.). Accordingly, after reviewing the Guidelines calculation, "the [court] should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. 38 at 49-50 (citations omitted).

### B.     Sentencing Guidelines Calculation

The government agrees with the Probation Officer that the applicable Guideline range for Ghorbani is 46-57 months, based on a total offense level of 23 and a Criminal History Category of I. Ghorbani PSR (ECF No. 94) at ¶¶ 10 & 74. The government also agrees with the Probation Office that the fine Guideline range for Ghorbani is $20,000 to $1 million. As explained below, based on an analysis of the factors set forth in 18 U.S.C. § 3553(a), the government submits that a sentence of at or near the high end of the applicable Guideline range and a $5,000 fine is appropriate here.

Further, the government agrees with the Probation Officer that the Guideline range for a violation of 18 U.S.C. § 371 follows the underlying substantive offense and that the U.S.S.G. does not specify a Guidelines range for a violation of 18 U.S.C. § 951. Where the Guidelines do not expressly specify a Guideline range, the court should "apply the most analogous guidelines. If there is not a sufficient analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." U.S.S.G. § 2X5.1; *see* Doostdar PSR at ¶¶ 10 & 33. The Probation Officer determined that there is no analogous guideline here, *see id*. at ¶ 73, and the government agrees. At the same time, given the overlapping and similar nature of the criminal conduct of the two defendants, the government

submits that, in determining an appropriate sentence for Doostdar pursuant to § 3553, the Court should use Ghorbani's Guideline range as a starting point for its analysis given the similarity in the underlying conduct. The government also agrees with the PSR that a two-level role adjustment would be appropriate if there were an applicable Guidelines range for Doostdar's conduct. *See id.* at ¶ 26.[8] The Court's starting point for its analysis of Doostdar's conduct should thus be a range of 57-71 months in prison.

The government also agrees with the Probation Officer that Doostdar organized, managed, and supervised the criminal activity of Ghorbani, and that he therefore would be deserving of a two-point enhancement for his role in this offense if the Guidelines applied. To receive a two-point adjustment under §3B1.1(c), a defendant must be "an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. §3B1.1(c). As the Application Note 4 to this Guideline recognizes, there "can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." That is precisely the case here.

Doostdar was, himself, acting on behalf of a government of Iran handler, but this does not negate the fact that he organized, managed and supervised the criminal activity of Ghorbani. While Ghorbani at times acted independently to gather and provide information about MEK to Iran, there is sufficient evidence to show that Doostdar recruited, tasked, paid, and supervised the activities of Ghorbani. Doostdar therefore would be deserving of a two-point enhancement under U.S.S.G. §3B1.1(c) if the Guidelines applied to his offense.

---

[8]    Where the Guidelines do not expressly specify a Guideline range, the Court should "apply the most analogous guideline. If there is not a sufficient analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable." U.S.S.G. § 2X5.1. In the case of Doostdar, the Chapter Three guidelines can be applied meaningfully.

Accordingly, the government is recommending that the Court sentence Doostdar to at or near the high end of a 57-71-month range and a $16,000 fine.

### C.    Statutory Penalties

For his conviction on Count Five of the Superseding Indictment, Ghorbani faces a maximum sentence for his conviction of 20 years' imprisonment, a fine of not more than $1,000,000, or both. 50 U.S.C. § 1705; 18 U.S.C. § 3571(b)(1); *see also* PSR at ¶ 92. The Court may impose a period of not more than three years of supervised release. 18 U.S.C. § 3583(b)(2). Such a term is optional and ordinarily should not be imposed in the case of a deportable alien unless required by statute. Ghorbani PSR at ¶¶ 79, 82. At this time, it is unclear whether Ghorbani is subject to deportation based on his conduct and conviction in this case.

For his conviction on Count One of the Superseding Indictment, Doostdar faces a maximum sentence of 5 years' imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3), or twice the pecuniary gain or loss, pursuant to 18 U.S.C. § 3571(d); and mandatory restitution under 18 U.S.C. § 3663A. The Court also may impose a term of supervised release of up to three years, pursuant to 18 U.S.C. § 3583(b)(2). The Guideline range is 1 to 3 years, based on the offense being a Class D felony. Doostdar PSR at ¶ 78.

For his conviction on Count Two of the Superseding Indictment, Doostdar faces a maximum sentence of 10 years' imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3), or twice the pecuniary gain or loss, pursuant to 18 U.S.C. § 3571(d); and mandatory restitution under 18 U.S.C. § 3663A. The Court also may impose a term of supervised release of up to three years, pursuant to 18 U.S.C. § 3583(b)(2). The Guideline range is 1 to 3 years, based on the offense being a Class C felony. Doostdar PSR at ¶ 78.

### D.      Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)

As discussed below, an analysis of the factors provided in 18 U.S.C. § 3553(a) shows that a sentence of at or near the high end of the applicable Guideline range and a $5,000 fine for Ghorbani and a sentence of at or near the high end of the 57-71-month range and a $16,000 fine for Doostdar each is an appropriate sentence in this case.

### 1.      The Nature and Circumstances of the Offense

The nature and the circumstances of the offense are undoubtedly serious: Doostdar and Ghorbani's actions potentially endangered the lives of U.S. citizens. For the MEK members and supporters whose information was gathered by Ghorbani and ultimately provided, through Doostdar or others, to the government of Iran, these actions could present a real risk of physical harm to themselves or their families. *See* Anderson Declaration at 4 & 8. As the Anderson Declaration makes clear, Iran has shown a willingness to use violence to achieve its ends against MEK members and dissidents in Western Europe and elsewhere. The information the defendants collected is consistent with Iran's creation of targeting packages that can be used in such attacks. It is entirely possible that Iran would try to act on the information the defendants provided in a similar way in this country. *See* Anderson Declaration at 3-4.

Even if the Court assumes that those Iranian dissidents and MEK members physically located within the United States are safe from the government of Iran's reach, the defendants' actions had a profound effect on these U.S. persons' sense of safety in this country, which likely had a chilling effect on their exercise of constitutional rights.

The defendants' conduct was designed to take advantage of the freedoms the United States Constitution affords its citizens and all persons located within its borders. The defendants took advantage of those freedoms to serve the needs of a hostile foreign regime that is a state sponsor

of terrorism. Doostdar came to the United States on behalf of that foreign regime to recruit Ghorbani, a legal permanent resident, to surveil and report on U.S. persons exercising their Constitutional rights to denounce that regime within U.S. borders. Ghorbani conducted that surveillance, sent the results to Iran, and in the process both of the defendants put lives at risk. Doostdar additionally took advantage of his U.S. citizenship to travel to this country to effect his conspiracy with the government of Iran—had he possessed only Iranian citizenship, Doostdar would undoubtedly not have been able to come and go as freely.

As shown by the Anderson Declaration, the information the defendants gathered is consistent with Iran's intelligence-gathering goals. The defendants also engaged in aspects of intelligence tradecraft, including counter-surveillance techniques, concern about communications on an open line, operational planning, tasking lists, and payments for information. *See id.* at 6-8. As Magistrate Judge Harvey found following Ghorbani's detention hearing, "These are all the hallmarks of state-sponsored espionage activities." ECF No. 25 at 48. Judge Harvey continued to note, "The question is which state." Doostdar admits that his actions were undertaken on behalf of the government of Iran, and Ghorbani admits his conduct—which included these hallmarks of state-sponsored intelligence activities—resulted in the provision of information to persons in Iran.

Moreover, defendants profited through their criminal conduct. Ghorbani received at least $5,000 in exchange for the services he provided that ultimately benefited the government of Iran. Doostdar entered the United States in August 2018 carrying $16,000 in cash. Given that he had paid Ghorbani on his two prior trips to the United States, and given that Doostdar made efforts to contact Ghorbani on this last visit, the government submits it is reasonable to assume that all or part of the $16,000 came from the government of Iran and was provided to Doostdar in connection

with his activities on behalf of the government of Iran. As noted above, Doostdar admitted to paying Ghorbani $3,000 at one of the July 2017 meetings during his post arrest interview.

The laws that Ghorbani and Doostdar admitted to violating further reflect the seriousness of their offenses. A violation of the laws prohibiting certain transactions with Iran is a significant criminal offense because, as then-president Bill Clinton declared in an Executive Order issued on March 15, 1995, those sanctions were implemented to combat the "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" caused by the government of Iran. Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 17, 1995). Each subsequent President has extended the sanctions against Iran. In other words, violating the sanctions laws constitutes a serious criminal offense because those laws help protect the national security and economy of this country, and advance our foreign policy with respect to Iran. The crime of violating the IEEPA statutes, enacted to protect the United States from terrorism and state-sponsors of terrorism, carries a maximum penalty of no more than 20 years of incarceration, a heavy punishment equal to the gravamen of the crime.

The U.S. Sentencing Commission has recognized the seriousness of providing services to Iran in particular. U.S.S.G. § 2M5.1 provides for a base offense level of 14, unless a national-security control was violated or the defendant engaged in a financial transaction with a state sponsor of terrorism, in which case the base offense level is 26. *Compare* U.S.S.G. § 2M5.1(a)(1) *with* § 2M5.2(a)(2); *see also United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (holding that an IEEPA violation is an evasion of a national security control, regardless of the nature of the good itself). That *twelve-level* difference underscores the seriousness of acting as an agent or providing services to a country like Iran. Although U.S.S.G. § 2M5.1 does not apply to Doostdar,

that Guideline should inform the Court's assessment of the seriousness of Doostdar's conduct vis-à-vis other defendants convicted of violating 18 U.S.C. § 951.

### 2. *The History and Characteristics of Each Offender*

#### a. **Defendant Ghorbani**

Ghorbani was born in Iran in 1959. Ghorbani first entered the United States in 1995. On May 28, 2015, Ghorbani became a Legal Permanent Resident of the United States. Until his arrest and incarceration in August 2018, Ghorbani had lived and worked in Costa Mesa, California, since he arrived in the United States.

Ghorbani has a high school education and has worked as a server and as a private caterer, for nearly 20 years. Ghorbani also has some retail experience. He is capable of making a living through non-criminal means. Ghorbani is not known to have any criminal convictions. He has a history of substance abuse (opium) but reportedly has never participated in substance abuse treatment. Ghorbani PSR at ¶¶ 58-59.

Ghorbani may be subject to removal. The PSR references the possibility of a departure under *Smith*, 27 F.3d 649. Ghorbani PSR at ¶ 100. The government does not believe a *Smith* departure is warranted in this case.

In *Smith*, the D.C. Circuit

> allowed [a] downward departure because of a defendant's status as a deportable alien, recognizing that because such aliens were ineligible for spending the last 10% of their sentences in community-based confinement and could not be assigned to minimum security prisons a defendant's deportable alien status would 'substantial[ly] ... affect the severity of his confinement.'

*United States v. Graham*, 83 F.3d 1466, 1481 (D.C. Cir. 1996) (quoting *Smith*, 27 F.3d at 655; other citation to *Smith* omitted). A *Smith* departure generally is limited to 10% of a defendant's

sentence and in no event more than six months. *See Smith*, 27 F.3d at 651; *United States v. Olivares*, 473 F.3d 1224, 1230-31 (D.C. Cir. 2006).

The *Smith* Court provided this guidance to district courts considering whether a departure based on a defendant's deportable alien status is appropriate:

> Further, we do not mean to suggest that a departure is in order whenever a factor unrelated to a prisoner's just deserts may affect the severity of his confinement. For a departure on such a basis to be reasonable the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence. Finally, as the defendant's status as a deportable alien is by no means necessarily unrelated to his just deserts, even a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved. Thus the court will fulfil the Guidelines' command that such departures will be "highly infrequent."

*Smith*, 27 F.3d at 655 (quoting U.S.S.G., Ch. 1, Pt. A, § 4(b)).

Here, it is unclear if Ghorbani is a deportable alien. Moreover, given the serious nature of Ghorbani's conduct, as described above, the government submits that the limited increase in severity of Ghorbani's sentence should he found to be deportable—at most an additional 4.6 -5.7 months (10% of 46-57 months) and the unavailability of a minimum-security prison—are not undeserved. Accordingly, a *Smith* departure is not appropriate.[9]

### b.    Defendant Doostdar

Doostdar was born in Long Beach, California, in 1980. He left the United States in 1982 and ultimately relocated to Iran. Doostdar has resided outside the United States continuously since 1982 and, before in or around 2017, had visited the United States only briefly on two occasions.

---

[9]    Should the Court deem a *Smith* departure appropriate in this case, such departure should not be greater than 10% of Ghorbani's sentence before any departure and in no event more than six months. *See Smith*, 27 F.3d at 651; *Olivares*, 473 F.3d at 1230-31.

He is a dual citizen of the United States and the Islamic Republic of Iran. Doostdar is well educated and capable of making a living through non-criminal means when he is released from incarceration.

### 3.   *The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public*

Deterrence and promoting respect for the law should be the principal goals of the Court's sentences in this case. In order to promote respect for the law—both by the defendants and the public—it is necessary and appropriate to impose a meaningful sentence. The defendants' disregard for U.S. law illustrates why the recommended sentences are justified to protect this country from new illegal schemes that the defendants, or others, might formulate. A sentence that is too lenient would convey the wrong message and could convince others that the financial rewards of doing illegal business with Iran, or acting as an agent of the government of Iran in the United States, are worth the risk or getting caught by U.S. law enforcement and facing a relatively minor penalty. That is especially so considering that Doostdar and Ghorbani's conduct potentially endangered lives.

As explained in the Anderson Declaration, "The information DOOSTDAR and GHORBANI provided to Iran is the type of information an Iranian intelligence service would use for additional research and to populate an eventual targeting package. The targeting packages would then be available for immediate use, or would be shelved for use in contingency planning for future action." Anderson Declaration at 5. Further, as opined by Mr. Anderson, "It is a top priority for the [government of Iran] to eradicate MEK/NCRI, either through kinetic attacks on individuals associated with the organization (including family, friends, or the organization itself), or through efforts to dismantle the organization and to neutralize its leadership." *Id*. at 8.

Furthermore, the recommended fines would serve an important purpose in preventing the defendants from profiting from their illegal activities.

### 4. *The Need to Avoid Unwarranted Sentencing Disparities*

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Such consideration presents challenges here where the defendants have pled guilty to different crimes based on their participation in the same conspiracy. Moreover, the government acknowledges that sentences for violations of both IEEPA and 18 U.S.C. § 951, as well as for conspiracies to commit these offenses, vary greatly—sentences commonly range from as low as 18 months in § 951 cases to as high as the statutory maximum, with many permutations in between. At the same time, the government's requested sentences are squarely within the range of similar sentences that have been imposed for similar offenses.

### a. **IEEPA Sentencing Cases**

Viewed in light of past sentences for violations of IEEPA, a sentence of at or near the high end of the applicable Guideline range (and a $5,000 fine) for Ghorbani is consistent with sentences imposed on similarly situated defendants. For example, in *United States v. Arsalan Shemirani*, 12-cr-0075 (D.D.C. Leon, J.), the defendant pled guilty, pursuant to a cooperation plea agreement, to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for purchasing nearly 3,700 electronic components with a total cost of more than $187,000 that were then illegally exported to his brother in Iran. Although the government requested a sentence of 36 months to take into account the defendant's cooperation, the court sentenced Shermirani to 48 months. This sentence was affirmed on appeal. *United States v. Shemirani*, 800 F.3d 1, 3-4 (D.C. Cir. 2015). In *United States v. Mohammad Reza Haijan*, 08:12-cr-00177 (M.D. Fla.), the defendant pled guilty to one

count of conspiring under 18 U.S.C. § 371 to violate IEEPA for exporting computers and computer-related equipment to Iran and was sentenced to 48 months' imprisonment. In *United States v. Laura Wang-Woodford*, 03-cr-0070 (E.D.N.Y.) the defendant pled guilty to one count of conspiring to violate IEEPA for her involvement in shipping aircraft component parts to Iran through other countries, and was sentenced to 46 months' incarceration, at the upper end of the range of the stipulated 37-46 month range contained in the parties' plea agreement.

Ghorbani's exports to Iran—services consisting of conducting physical surveillance and providing photographs and other information regarding members of the MEK—were more nefarious than the exports at issue in the cases discussed above or in most of the legions of other IEEPA cases involving illegal imports of goods to Iran. As explained above and in the Anderson Declaration, what Ghorbani was exporting was information that could be used to target specific individuals for physical harm.

Moreover, according to the Guidelines Application Notes,

> In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences.

U.S.S.G. § 2M5.2 app. n.2 (Nov. 1, 2012). Ghorbani's crime involved extensive planning and deceit. For example, Ghorbani misrepresented himself to infiltrate the MEK and, along with Doostdar, used code names and coded language and counter-surveillance techniques. *See* Anderson Declaration at 14-15 & 23. Accordingly, a sentence at or near the high end of the Guidelines is appropriate here.

**b.**     **Section 951 Sentencing Cases**

Unlike other criminal law violations where there is a significant body of prior cases, there are relatively few cases involving violations of 18 U.S.C. § 951 or conspiracies to violate § 951. And, as noted above, the sentences for these cases vary widely. In reviewing the nine cases the government has been able to identify that involve acts committed on behalf of a foreign government, the government notes where individuals have been convicted of conducting activities on behalf of a hostile foreign intelligence service, or where their conduct is particularly egregious, the sentences tend to be higher. The government also notes that it is aware of no case involving defendants who have been sentenced for assisting in the creation of targeting packages on behalf of the government of Iran from within the United States.

A number of § 951 cases involve activities conducted in the United States on behalf of countries where, at the time those activities were conducted, the sponsoring country was been designated by the United States as a state sponsor of terrorism. For instance, the defendant in *United States v. Dumeisi*, No. 03-cr-664 (N.D. Ill.), was convicted at trial of violating §§ 951 and 371, as well as two counts of perjury. Dumeisi worked as an Iraqi agent in the United States where he printed stories in his newspapers as directed by the Iraqi Intelligence Services (IIS) and provided information on Iraqi dissidents. During the period in which he conducted these activities, Iraq was designated by the United States as a state sponsor of terrorism; Iraq was removed from this list in 2004. During that time frame, the United States also maintained a trade embargo on Iraq. Dumeisi was sentenced to a total of 46 months' incarceration.

Similarly, the defendant in *United States v. Latchin*, No. 04-cr-661 (N.D. Ill.), was convicted of violations of §§ 951 and 371, as well as an IEEPA violation and immigration offenses, for agreeing to act as a "sleeper agent" in the United States on behalf of the IIS. His conduct also

occurred while Iraq was designated by the United States as a state sponsor of terrorism, and while the Iraqi embargo was in place. The government in that case could not prove what covert actions, if any, Latchin took on behalf of IIS, other than making calls to IIS handlers about unknown topics and collecting $24,000 from IIS agents during a trip abroad (which formed the basis of the IEEPA violation). He was nonetheless sentenced to 48 months' incarceration on each count, including §§ 951 and 371, to run concurrently.[10]

In *United States v. Carlos Alvarez*, No. 05-cr-20943 (S.D. Fla.), Alvarez was sentenced to the statutory maximum (60 months) after pleading guilty to conspiracy to act as an agent of Cuba in violation of 18 U.S.C. § 371. Over a period of approximately 30 years, Alvarez had gathered information on prominent people, community attitudes, political developments and current events of interest to the Cuban government, and passed that information to Cuba. The United States designated Cuba as a state sponsor of terrorism between 1982 and 2014, such that much of Alvarez's activities occurred while Cuba was so designated. During this period, the United States also maintained sanctions against Cuba.

The defendant in *United States v. Duran*, No. 07-cr-20999 (S.D. Fla.), was sentenced to 48 months' incarceration after trial. In August 2008, a United States citizen couriered an $800,000 campaign contribution from the Venezuelan government to the Argentine presidential candidate. In the hope of concealing the source of this money, the Venezuelan intelligence agency, Dirección de los Servicios de Inteligencia y Prevención, sent Duran to the United States to bribe and/or extort

---

[10]   By contrast, in *United States v. al-Awadi*, No. 07-cr-20314 (E.D. Mich., 2007), the defendant pled guilty to one count of violating 18 U.S.C. § 951. Al-Awadi supplied the Iraqi Intelligence Service ("IIS") with reports on the activities of dissident Iraqi expatriates within the United States for approximately five years during the Saddam Hussein regime, from 1997-2002. Al-Awadi was paid by the IIS for his services. Al-Awadi was sentenced to 18 months' incarceration. At the time of his sentencing, al-Awadi was 78 years old and in poor health.

the United States citizen into claiming that the money was his, not the Venezuelan government's. The government notes that Duran had a lengthy history of bribing public officials, and was convicted at trial.

The remaining § 951 cases of which the government is aware involve individuals who conducted activities within the United States on behalf of Russia and China. Both Russia and China are geopolitical and economic adversaries of the United States, in that both countries take positions that are contrary to United States interests, both domestically and abroad. In one such case, *United States v. Buryakov*, No. 15-Cr-73 (S.D.N.Y.), the defendant entered a plea of guilty to violating § 951 for photographing critical New York infrastructure and reporting on it, among other things, to a Russian official. The defendant was sentenced to 30 months of incarceration.  Similarly, in *United States v. Chun*, No. 16-Cr-518 (S.D.N.Y.), the defendant, a former FBI electronics technician with a security clearance, was sentenced to 24 months' incarceration after providing sensitive information to Chinese officials over a period of years.[11]

The government is aware of only one recent § 951 case in this District: *United States v. Maria Butina*, No. 18-cr-218 (D.D.C. 2019). Over a period of approximately two years, Butina acted in the United States at the direction and control of a Russian official, without notifying the Attorney General. Butina sought to establish unofficial lines of communication between Russia and Americans having power and influence over U.S. politics and to use those lines of communication for the benefit of the Russian Federation. Butina's efforts were focused on spotting and assessing individuals for possible recruitment by Russia, unlike the conduct in this case, where

---

[11]     By contrast, the defendant in *United States v. Lin*, No. 15-601 (E.D.N.Y) was sentenced to five years' probation for violating § 951 by using her position as a counter agent at an airport to smuggle items onto flights departing from New York to China at the direction of Chinese officials. That case, which was initially charged as a smuggling case, involves conduct that is readily distinguishable from the current case.

the defendant's actions could put individuals at risk of physical harm. Butina pleaded guilty to one count of conspiracy to act as an agent of the Russian Federation, in violation of 18 U.S.C. § 371, which carries a statutory maximum sentence of five years' incarceration. Butina was sentenced to 18 months after the government's request for a downward departure for cooperation pursuant to U.S.S.G. § 5K1.1 was granted.

The United States designated Iran as a state sponsor of terrorism in 1984, and considers Iran a geopolitical opponent.  The cases above demonstrate that the government's recommendations in this case are squarely within the heartland of similar cases. For all the reasons stated above, sentences of at or near the high end of the applicable Guideline range and a $5,000 fine for Ghorbani and at or near the high end of the 57-71-month range and a $16,000 fine for Doostdar are warranted by their actions taking advantage of the freedoms afforded by the United States Constitution to surveil Iranian dissidents on U.S. soil, before sending information about those dissidents to a hostile foreign regime. Those requested sentences are well within the range of previous sentences imposed in similar cases, which satisfies 18 U.S.C. § 3553(a)(6).

## CONCLUSION

WHEREFORE, the government respectfully recommends that the Court sentence Doostdar to at or near the high end of the 57-71-month range and a $16,000 fine and Ghorbani to at or near the high end of the applicable Guideline range of 46-57 months and a $5,000 fine.

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By: _____/s/_____
JOCELYN BALLANTINE
ERIK KENERSON
JOLIE F. ZIMMERMAN
Assistant United States Attorneys
CA Bar No. 208267 (Ballantine)
Ohio Bar Number 82960 (Kenerson)
D.C. Bar No. 465110 (Zimmerman)
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: 202-252-7252 (Ballantine)
202-252-7201 (Kenerson)
202-252-7220 (Zimmerman)
Email: Jocelyn.Ballantine2@usdoj.gov
Erik.Kenerson@usdoj.gov
Jolie.Zimmerman@usdoj.gov

<u>Certificate of Service</u>

I HEREBY CERTIFY that a copy of the foregoing Memorandum in Aid of Sentencing was delivered via the Court's electronic filing system on counsel for the defendant, this 10th day of January, 2020.

/s/
Jolie F. Zimmerman
Assistant United States Attorney