**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **18-CR-255-02 (PLF)** |
| **MAJID GHORBANI** | : | |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

On December 11, 2017, Majid Ghorbani provided photographs of a public event to his co-defendant, Ahmadreza Doostdar.   On the back of the photographs, Mr. Ghorbani identified well-known members of the Mojahedin-e Khalq ("MEK"), who were depicted in the photographs.   Mr. Ghorbani knew that Mr. Doostdar would take the photographs and share them with individuals in Iran.   Based on this conduct, on November 4, 2019, Mr. Ghorbani entered a guilty plea to one count of violating the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705, 31 C.F. R. § 560.204, 560.206.   He will appear before this Honorable Court for sentencing on January 15, 2020.   For the reasons set forth below, Mr. Ghorbani respectfully requests that the Court impose a sentence of time served, followed by a term of supervised release.   Although this would be a variance from the recommended sentencing range under the United States Sentencing Guidelines, such a sentence is appropriate given the nature of the offense and Mr. Ghorbani's age, health, and lack of any prior criminal record.   In support of this request, counsel submits the following.

<u>**Factual Background**</u>

Mr. Ghorbani is 60 years old.   He was born in Tehran, Iran and grew up in extreme poverty.   He lived with his parents and siblings in a small two room home with no running water

or electricity.   He was the fourth of ten children; three of his siblings died at very young ages due to dysentery and the lack of medical care.

Mr. Ghorbani's father worked long hours at a restaurant in order to support the family. His father would leave the home before the children were awake and return after they were asleep in the evening.   In addition to attending school, Mr. Ghorbani (as the second oldest son) was required to do most of the household chores, including shopping and cooking for the family. Mr. Ghorbani remembers a childhood   marked by deprivation and frequent beatings inflicted by his mother and school teachers.

When he was twelve years old, Mr. Ghorbani begged his father to let him work with him at the restaurant.   Eventually, his father relented and helped him obtain a job as a busboy.   Mr. Ghorbani went to school during the day and worked at night, and his father kept his salary to support the family.   In 1978, he graduated from high school and continued working.   He enjoyed working in the restaurant and eventually became a sous-chef and then the executive chef.

In 1978, the demonstrations that led to the Iranian revolution began.   Like most Iranians then, Mr. Ghorbani believed the Shah of Iran was responsible for the poverty that he had experienced and trusted the revolutionaries' promises of a better life with independence and freedom.   Mr. Ghorbani thus supported the revolution.   Not long after Ayatollah Khomeini took power, however, it became clear that these were empty promises.   The fancy slogans quickly faded, along with hopes of true freedom.   As Mr. Ghorbani describes life in Iran after the revolution, the soccer team was renamed "Independence;" a traffic circle was renamed "Freedom," but the people of Iran were not independent or free.   The new regime imposed

2

numerous mandatory requirements of everyday life under the guise of Islamic law, and beat

those who disobeyed, accusing violators of "warring with God."

In the early 1980s, the Iran-Iraq war began.   Mr. Ghorbani vividly remembers the

horrors he experienced during the war.   The government of Iran planted landmines instead of

gardens in their backyards, and children carried grenades instead of books.   Mr. Ghorbani was

conscripted into the Iranian army and sent to the front lines.   He watched as his fellow soldiers

were slaughtered, and remembers looking at empty foxholes next to him and crying.   During

one battle, he was hit by shrapnel and wounded, including wounds on his left shoulder near his

aorta.   He was hospitalized for six days and had three operations to remove shrapnel.

Eventually, he was sent back to active duty and assigned to work in the field kitchen, behind the

front lines.

After his discharge from the military, Mr. Ghorbani obtained a job working at a

restaurant in the airport, and later at the Sheraton Hotel in Tehran.   He began as a chef and

worked his way up to a position managing the restaurant at the Sheraton.   He married Manijeh

Massouzadeh, and two years later, they had a daughter, Sogand Ghorbani.

Mr. Ghorbani continued to enjoy working in the restaurant business, but hostilities with

Iraq continued and living in Iran was dangerous.   Although the war with Iraq ended in 1988, Mr.

Ghorbani continued to fear for the safety of his family in Iran due to the strict laws and

particularly the treatment of women under the new regime.   On one occasion, Mr. Ghorbani and

his wife were shopping and officials stopped them and accused his wife of not wearing

appropriate clothing.   He tried to defend his wife and argued with the agents.   In response, he

was accused of inciting a crowd and jailed, where he was beaten and whipped by authorities.

Following his release, Mr. Ghorbani decided to try to move to the United States to escape the new regime.

Mr. Ghorbani's parents, two brothers, and a sister moved to California prior to his decision to leave Iran, and he hoped to obtain lawful immigration status in the United States through his parents.   He applied for a visa, but unfortunately the visa was denied.   U.S. officials told him that because he had a wife and child in Iran, visa approval would take approximately six years.   He decided to apply for, and later received, a visa to travel to Mexico.   He planned to build a life in Mexico and move his family there.

After living in Mexico for a few months, some friends asked him if he wanted to attend a sporting event in California with them.   He agreed, but did not believe he would be permitted to enter the United States.   He went with his friends and to his surprise, they simply walked across the border.   Happy to be in the United States, he contacted his family.   Once here, he could not bring himself to leave.   A short time later, Mr. Ghorbani's wife and daughter moved to the United States to live with him.

Soon after entering the United States, Mr. Ghorbani began working at a store that his brother operated, and he started the process of seeking legal status through his father, who had obtained citizenship.   In approximately 1999, Mr. Ghorbani obtained a job working as a server at Darya Restaurant, where he worked until his arrest in the instant matter.

In 2005, after a long battle with cancer, Mr. Ghorbani's father, along with his mother, returned to Iran to see his children and grandchildren who were still living there, knowing he would die soon.   While in Iran, his mother had a heart attack and died; hours later, his father died.   Because he did not have lawful status in the United States and did not want to leave his

daughter and risk being unable to return to the United States, Mr. Ghorbani could not attend the funerals.

After losing both of his parents, Mr. Ghorbani was required to restart his attempt to gain lawful immigration status -- this time through his brother, who also had become a citizen.   The process took another ten years, and he finally became a lawful permanent resident in 2015.

Mr. Ghorbani and his wife separated approximately 15 years ago, but they remained close friends.   Mr. Ghorbani continued to financially support his wife until his arrest, and they continued to raise their daughter jointly.   Mr. Ghorbani supported the family through small catering jobs, in addition to working at Darya.

As noted above, the offense at issue here occurred when Mr. Ghorbani gave his co-defendant photographs of an MEK rally.   The indictment states, and the government has previously represented, that the MEK was "created by a group of individuals who opposed the 1979 Iranian revolution."   ECF No. 51 at 5; ECF No. 67 at 2.   The government's position oversimplifies the political complexities in Iran during and after the revolution.   In fact, the MEK was created by individuals who supported the Iranian revolution, but opposed the faction of revolutionaries who took control following the revolution and formed the current Iranian regime.   *See*, *e.g.*, *Iranian Dissidents Convince U.S. to Drop Terror Label*, The New York Times (Sept. 21, 2012), available at https://www.nytimes.com/2012/09/22/ world/middleeast/iranian-opposition-group-mek-wins-removal-from-us-terrorist-list.html ("the Mujahedeen Khalq, known as the M.E.K., . . . lost a brutal power struggle with supporters of Ayatollah Ruhollah Khomeini in the first years after the Islamic Revolution in 1979 and then relocated to Iraq").   The MEK has a controversial history and was previously designated as a

terrorist organization by the United States.   It is similarly unclear whether the Iranian people

even support the MEK.   *See*, *e.g.*, *id.* (reporting that an Iranian expert states that the MEK is

"'widely viewed as a backward and intolerant cult by their opposition peers in Iran,'" and

"[a]fter the terrorist label is dropped, [the expert] said, "I don't think the world really looks that

much different.   U.S.-Iran relations will remain hostile, and the M.E.K. will remain a fringe cult

with very limited appeal among Iranians.'").

   Mr. Ghorbani was, however, a supporter of the MEK. He met members of the MEK

while working at Darya.   These members frequently invited him to attend MEK meetings, but

the meetings were held on Saturday nights.   Mr. Ghorbani worked on Saturday nights, so he did

not attend the meetings.   Because he is not supportive of the current Iranian regime, Mr.

Ghorbani was supportive of the MEK, and on occasion, made small financial donations ($100-

$200) to their cause.

   In July 2017, Mr. Ghorbani was approached by Mr. Doostdar, whom he had not

previously met.[1]   Mr. Doostdar came to Darya while Mr. Ghorbani was working and introduced

himself as a friend of Mr. Ghorbani's cousin's husband.   Mr. Doostdar gave Mr. Ghorbani a

---

[1] The government has asserted that Mr. Doostdar was told that Mr. Ghorbani previously acted on behalf of the government of Iran.   This is false.   This assertion is apparently based solely on the government's interpretation of text messages found on a cellphone belonging to Mr. Doostdar's wife and Mr. Doostdar's Statement of Offense.   *See* ECF No. 76.   Mr. Ghorbani respectfully submits that regardless of what Mr. Doostdar was or was not told, Mr. Ghorbani did not previously act on behalf of the government of Iran (and did not knowingly do so in relation to his contacts with Mr. Doostdar).   Moreover, the evidence demonstrates that the information that Mr. Doostdar allegedly was provided about Mr. Ghorbani was not correct.   The Statement of Offense, ECF No. 76, signed by Mr. Doostdar alleges that Mr. Doostdar was told before he first approached Mr. Ghorbani in July 2017 that Mr. Ghorbani "probably would have photos for him," but Mr. Ghorbani did not provide photographs or any other materials to Mr. Doostdar in July 2017.

package containing pistachios, saffron and hard candy, and told Mr. Ghorbani that the package was from his family.   Mr. Doostdar indicated that he wanted to open a restaurant in the United States, and Mr. Ghorbani gave him advice on doing so.

In September 2017, Mr. Ghorbani attended an MEK rally in New York.   One of his acquaintances from the restaurant invited him to attend the rally and paid for his airplane ticket.[2] At the event, using his cellphone, Mr. Ghorbani, like many other attendees, took photographs of the rally, including photographs of well-known celebrities and members of the MEK.

On December 10, 2017, Mr. Doostdar returned to California and again visited Mr. Ghorbani.   Mr. Ghorbani told Mr. Doostdar that he had attended the MEK rally two months earlier in New York and showed Mr. Doostdar the photographs on his cellphone.   Mr. Doostdar asked for copies of the photographs, and later that day, Mr. Ghorbani went to a CVS store and made copies for Mr. Doostdar.

The following day, December 11, 2017, Mr. Ghorbani met again with Mr. Doostdar and gave him the copies.[3]   On the backs of the photographs, Mr. Ghorbani identified the publicly known celebrities and MEK officials.   Mr. Ghorbani knew that Mr. Doostdar would take the photographs and share them with individuals in Iran.   At the time, Mr. Ghorbani believed that he was not doing any harm because the event was a public event.   There was nothing secret about the event or the attendees, and photographs of the attendees were widely published on the

---

[2] The MEK has been reported to "rent a crowd" for its functions in order to provide images of wide-spread support for its cause.   *See*, *e.g.*, https://nationalinterest.org/blog/paul-pillar/mek-and-bankrupt-us-policy-iran-35982 (discussing MEK's use of rent-a-crowd technique); https://theglobepost.com/2018/08/01/mek-unpopular-iran/ (same).   Mr. Ghorbani's experience is consistent with those reports.

[3] Counsel will provide copies of the photographs to the Court at the sentencing hearing.

internet.  *See*, *e.g.*, https://english.mojahedin.org/newsen/58317/iranian-supporters-of-the-

resistance-demonstrate-in-nyc-.   Mr. Ghorbani did not take the photographs "surreptitiously," as

the government previously claimed, *see* ECF No. 51 at 8.   Those Mr. Ghorbani identified were

well-known to be members or supporters of the MEK, attending an event that was designed to be

widely publicized and demonstrate support for the MEK.[4]   For example, Eskandar Filabi was

---

[4] The government's actions support Mr. Ghorbani's belief that providing these materials to
individuals in Iran would not cause harm, and that he was not providing information that was not
otherwise publicly available.   When government agents searched Mr. Doostdar's belongings
before he left the United States in December 2017, the agents merely photographed the front and
backs of the photographs Mr. Ghorbani had given Mr. Doostdar.   The agents did not seize the
photographs, but rather permitted Mr. Doostdar to return to Iran with the photographs (and share
the photographs with whomever he chose).

The government also has alleged that Mr. Ghorbani intended to provide Mr. Doostdar
with information about a May 2018 MEK meeting he attended in Washington, D.C. – again,
MEK members invited Mr. Ghorbani to the event and paid for his travel, presumably to boost
attendance.   As the government has acknowledged, the MEK members sought Mr. Ghorbani's
attendance – Mr. Ghorbani did not seek an invitation to the event, and MEK members had to
convince him to attend.   *See* Gov't Opp. to Mtn. to Reconsider, ECF No. 51 at 9.   That meeting
was not a private event and no clandestine surveillance was necessary for anyone to obtain
information about the event or its participants.   Anyone with access to the internet could view
the event.   As the government has acknowledged, ECF No. 51 at 10, two days after the event, an
organization supportive of the MEK uploaded a video of the event to YouTube and the video
includes views of speakers and attendees (including Mr. Ghorbani).

In addition, the government has suggested that because the MEK opposes the current
Iranian regime, Mr. Ghorbani must have known that Mr. Doostdar was working with the
Government of Iran.   This conclusory assertion is far too narrow.   From Mr. Ghorbani's
perspective, Mr. Doostdar was seeking photos of public figures in public events that were
accessible to anyone with internet.   It is reasonable to assume that the government of Iran has
internet and thus has access to the same information about the MEK as Mr. Ghorbani.
However, other individuals or opposition groups in Iran – as noted above other opposition
groups view the MEK as a "backward intolerant cult" – may not have access to the internet
(controlled by the government of Iran), but may be seeking information about the MEK and its
support in the United States.

Finally, the government has noted that in April 2018, Mr. Ghorbani was found in
possession of a document which contained "a list of taskings to collect additional intelligence on

identified as a "member of the organization; former wrestling champion of Iran."   Mr. Filabi is a

well-known supporter of the MEK, who speaks publicly at MEK events.   *See*

*https://commons.wikimedia.org/wiki/File:Moslem_Eskandar-Filabi_in_PMOI_*

*demonstration_2017.jpg.*   Others photos identified individuals related to Massoud Rajavi, who

led the MEK before his disappearance in 2003.   *See https://en.wikipedia.org/wiki/Massoud_*

*Rajavi.*   The identity of these family members and their support for the MEK is public

information.   Other photographs identified the "spokesperson" for the MEK, the person in

charge of organizing their speeches, an actress and a movie producer.   Again, this was not secret

information.

     Since his arrest in this case, Mr. Ghorbani has been held without bond.   His detention

has been extremely difficult on his mental and physical health.   His family – his daughter, two

brothers and his sister -- live in California and incarceration in the District of Columbia has been

lonely and painful.   Many years ago, Mr. Ghorbani suffered a back injury that has caused him

great pain over the years.   His incarceration has exacerbated that injury and pain, and he now

needs a cane for assistance when walking.

     His arrest also has been financially difficult for his daughter, Sogand and his wife,

Manijeh.   After his arrest in this case, because she no long had financial support from

Mr. Ghorbani, Manijeh moved back to Iran.   Sogand reports that Manijeh deeply regrets that

---

individuals associated with the MEK," ECF 51 at 9, and the list included requests for
information that was not publicly available.   However, Mr. Ghorbani never gathered or
transmitted non-public information.   The only contact Mr. Ghorbani had with Mr. Doostdar
following April 2018 (when the list was found) was a telephone conversation on May 14, 2018,
during which Mr. Doostdar asked Mr. Ghorbani to send him information, and Mr. Ghorbani
refused.

decision because life in Iran is extremely difficult for her.   Manijeh is staying with her brother,

who has very limited financial means, and she was recently diagnosed with cancer.   Sogand

likely will never see Manijeh again.   Sogand Ghorbani has been granted withholding of

removal, but cannot leave the United States without losing that status.   Her mother, Manijeh,

does not have lawful status to return.

Sogand Ghorbani also has struggled financially.   As a direct result of her father's arrest,

she lost her job.   At the time of his arrest, she worked for an ophthalmology office.   After his

arrest, she took time off to travel to the District of Columbia to support her father.   When she

returned to work, her manager told her that she thought Ms. Ghorbani would be too distracted by

her father's situation and should not continuing working.   The employer suggested that Ms.

Ghorbani contact them again after her father's situation had settled.   She contacted the employer

several months later, but they would not rehire her.

Mr. Ghorbani has a very close relationship with his daughter, and she has been very

supportive of him since his arrest.   As noted in the Presentence Investigation Report ("PSR"),

Sogand Ghorbani reports that Mr. Ghorbani is a "great father," who helps others whenever he

can.   Mr. Ghorbani is heartbroken, knowing that his actions caused her harm.   Her support,

through letters and telephone calls, have sustained him through his incarceration, and he wants

nothing more than to return to his daughter – who has found new employment in California and

recently gave birth to Mr. Ghorbani's first grandchild – and to provide her with whatever support

he can provide.

Mr. Ghorbani was joyful when he obtained his green card in 2015.   He values his ability

to live freely in the United States and deeply regrets that his actions in relation to the instant

matter have put his ability to do so in jeopardy.   Despite his conviction in this matter,

Mr. Ghorbani hopes to be able to remain in the United States with his daughter and his newborn

grandson.[5]

### Argument

When imposing a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;

> (2) the need for the sentence imposed –

>> (A) to reflect the seriousness of the offense, to promote respect
>> for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant;
>> and

>> (D) to provide the defendant with needed educational or
>> vocational training, medical care, or other correctional
>> treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established for
> [the applicable offense and the applicable category of
> defendant as set forth in the Sentencing Guidelines];

---

[5] Counsel notes that the Probation Office recommends that the Court order Mr. Ghorbani to
surrender to the U.S. Immigration and Customs Enforcement agency as a condition of supervised
release.   No immigration proceedings have been instituted against Mr. Ghorbani and no detainer
has been filed.   Moreover, Mr. Ghorbani did not, as part of the plea agreement, surrender any of
his rights to challenge any attempt by ICE to revoke his status as a permanent resident.   Mr.
Ghorbani recognizes that he is required to follow any lawful orders issued in relation to his
immigration status, just as he is required to follow all U.S. laws.   There is no basis or need to
require him to surrender or report to ICE and no need for a specific condition of release relating
to his immigration status.

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added).   With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."   18 U.S.C. § 3553(a) (emphasis added).

**(1)      The United States Sentencing Guidelines.**

As set forth in the PSR, the recommended sentencing range under the United States Sentencing Guidelines is 46 to 57 months.   However, when sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable."   *Gall v. United States*, 552 U.S. 38, 50 (2007).   Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.   *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in

12

§ 3553(a).   *Gall*, 552 U.S. at 50.   Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it.   *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors."   *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

When considering the Guidelines in this case, the Court should consider that U.S.S.G. § 2M5.1 provides for a base offense level of 14 for some evasions of export controls, but provides for a base offense level of 26 in other circumstances, including when the expert controls constitute "national security controls" and when "the offense involved a financial transaction with a country supporting international terrorism."   As part of the plea agreement, the government required Mr. Ghorbani to agree that base offense level 26 applies here, and he did so based on cases cited by the government, holding that the IEEPA constitutes national security controls.   *See* ECF No. 51 at 15 (citing *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (exportation of goods in violation of Libyan embargo constituted violation of national security controls even if specific goods did not implicate national security interests)).

However, while base offense level 26 applies, the instant matter did not, in fact, involve the transfer of goods that directly implicate national security interests, such as weapons or

classified or sensitive information.   The conduct at issue here – particularly given the public availability of the information transferred and Mr. Ghorbani's lack of intent to cause harm – is not as egregious as other violations covered by § 2M5.1(a)(1).   *See*, *e.g.*, *United States v. Cheng*, 392 F. Supp. 3d 141; 148 (D. Mass. 2019) (departing upward to impose sentence of nine years because defendant shipped highly sensitive goods with nuclear applications to Iran and scheme involved substantial volume of commerce, numerous occurrences, and a serious threat to national security); *United States v. Vasquez*, 745 Fed. Appx. 321, 322-23 (11th Cir. 2018) (defendant who entered guilty plea to participating in weapons smuggling scheme sentenced to 46 months); *United States v. Kuyumcu*, No. 16-cr-308 (DLI), 2017 WL 3995576 (E.D.N.Y. Sept. 8, 2017) (defendant who shipped Colbalt Powder with potential military and nuclear applications to Iran and continued to attempt to do business with Iran sentenced to 57 months); *see also McKeeve*, 131 F.3d at 14-15 (defendant who violated expert controls by selling computer equipment to Libya and obstructed justice by committing perjury when testifying at his trial sentenced to 51 months).

The Commentary to § 2M5.1 recognizes the wide range of conduct covered by this provision and suggests that when determining an appropriate sentence, the Court should "consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences."   U.S.S.G. § 2M5.1, Application Note 2.   Here, the information provided was public, there was no direct threat to U.S. security interests, and there was no commerce involved – no effort to send dangerous weapons or products.   Mr. Ghorbani entered a plea to

14

providing photographs on one occasion, and, as noted above, despite the government's

accusations, there were no other violations.

Here, if § 2M5.1(a)(2) applied with a base offense level of 14, the applicable

recommended sentencing range would be 10 to 16 months (base offense level 14, minus 2 levels

for acceptance of responsibility).   The § 3553(a) factors – particularly, the nature of the offense,

Mr. Ghorbani's age, lack of a prior record, employment history, and poor health – mitigate

against imposition a sentence within the sentencing range recommended by the Guidelines for

violating national security controls and closer to the range for other violations of export controls.

Mr. Ghorbani has now served 17 months and has earned 76 days of good time credits.   He,

therefore, he has served a sentence of 19 ½ months (more than a sentence within the range for

violating export controls that do not constitute national security controls).

**(2)     The Nature and Circumstances of the Offense.**

The nature of Mr. Ghorbani's violation supports a sentence of time-served.   The

photographs and information provided by Mr. Ghorbani was well-known public information, and

similar photographs are available on the internet.   When Mr. Ghorbani provided the information

to Mr. Doostdar, he did not seek to or have any reason to believe this public information would

cause harm to anyone.   Mr. Doostdar notes in the sentencing memorandum filed on his behalf,

ECF 105, that he never intended for his actions to lead to violence of any kind, *id.* at 7.   And he

certainly never conveyed any such intent to Mr. Ghorbani.

Mr. Ghorbani did not attend MEK events at Mr. Doostdar's direction or for any nefarious

purpose, but rather at the request of MEK members.   For Mr. Ghorbani, taking photos of public

figures in public places did not mean that he was working against the MEK or for any particular

organization.    The government argues that Mr. Ghorbani indeed did know that there was an

ultimate purpose behind obtaining those photos that was far more nefarious.    However, while

others may have *hoped for* further assistance from Mr. Ghorbani, he did not provide such help.

Mr. Ghorbani provided photos of public figures precisely because those actions are not

objectively harmful.    Despite the FBI's best efforts and dozens of hours of surveillance, the

government's evidence does not demonstrate that he sought to harm the MEK.

Indeed, the government's evidence proves the opposite.    When Mr. Doostdar's requests

later escalated to tasks beyond taking photos – tasks that were not objectively harmless,

Mr. Ghorbani refused.    This refusal demonstrates that the government's assertions about

Mr. Ghorbani's culpability are far overstated.    Mr. Ghorbani should be sentenced only for the

crime to which he entered a guilty plea: providing photos of public figures in public places.[6]

---

[6] As the Probation Office has noted, Mr. Doostdar is the more culpable participant in the charged conduct.    *See* PSR ¶ 21.    Mr. Doostdar knowingly acted on behalf of the government of Iran and entered a guilty plea to acting as an unregistered agent of the Iranian government.

In disputing the relative roles of Mr. Doostdar and Mr. Ghorbani, Mr. Doostdar cites the portion of Mr. Doostdar's signed Statement of Offense which states that Mr. Ghorbani indicated that he would travel to Iran during Eid and would bring "additional materials."   ECF 105 at 14 n.26. Mr. Ghorbani traveled to Iran solely to visit family.   There is no evidence that Mr. Ghorbani provided any information to anyone while in Iran.

Mr. Doostdar also notes that he was authorized to provided Mr. Ghorbani with $3,000 during their first meeting.   ECF 105 at 14.   While Mr. Doostdar may have been told he could do so – as his text messages suggest – he did not do so.

In addition, Mr. Doostdar erroneously states that information regarding *two* MEK rallies was provided to Mr. Doostdar.   ECF No. 105 at 6.   Although Mr. Ghorbani attended two MEK rallies (at the request of MEK members), only the photographs taken at the September 2017 rally were provided to Mr. Doostdar.

Moreover, the results of his conduct to date have dramatically impressed upon him the severe consequences of breaking the law and constitute a significant punishment. Mr. Ghorbani's detention in the District of Columbia, far from the support of his family, has been difficult.   His mental and physical health have suffered.   In addition, after completion of his sentence in this matter, he will face the looming threat that he will lose his permanent residency and be deported back to Iran.   While the government has portrayed him as an agent of Iran, he is not.   If he is returned to Iran, he is likely to be detained and questioned.   While this may seem counter-intuitive, the Iranian regime does not act rationally and may believe that Mr. Ghorbani is a threat based on the allegations and his detention in this matter.   In fact, at least one member of Mr. Ghorbani's extended family who lives in Iran was detained and questioned by Iranian authorities after his arrest.   Others had to move from a long-time home due to scrutiny they faced as a result of their relationship to Mr. Ghorbani.

**(3)   The History and Characteristics of the Defendant.**

Mr. Ghorbani has never before been convicted of a criminal offense.   He is now 60 years old, significantly older than the average defendant.   His age and lack of a prior record support a variance.   The United States Sentencing Commission has identified increased age as a powerful predictor of reduced recidivism.   U.S.S.C., *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005), at 13-15, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20050104_Recidivism_Salient_Factor_Computation.pdf.   The Sentencing Commission has reported that "[r]ecidivism rates decline relatively consistently as age increase."   U.S.S.C., *Measuring Recidivism: The Criminal History*

*Computation of the Federal Sentencing Guidelines* (May 2004), at 12 & Ex. 9, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/ 2004/200405_Recidivism_Criminal_History.pdf.

Sentences imposed on older offenders also have harsher effects, supporting a finding that a lesser sentence can achieve the goals of sentencing.   Any sentence is a greater proportion of an older offender's remaining life.   *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness).   Older offenders who commit their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and are "easy prey" for more experienced inmates.   *See* U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/2004/018735.pdf.   Older offenders also are more likely to have medical issues and suffer from mental health problems, and therefore, they are more likely to suffer greater punishment than the average inmate.   *See* Laura Maruschak, *Medical Problems of Prisoners*, Bureau of Justice Statistics, Tables 1, 2, 4 (Apr. 2008), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/mpp.pdf; Katie Gray, *America's Aging—and Mentally At-Risk—Prisoners*, The Crime Report (Nov. 7, 2016), *available at* http://thecrimereport.org/2016/11/07/americas-aging-and-at-risk-prisoners/#.

The Court should also consider that aging inmates also are more costly to incarceration. *See* U.S. Dept. Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons at i (May 2015, revised February 2016) ("aging inmates," defined

as inmates 50 years old or older, more costly to incarcerate due to increased medical needs),

*available at* https://oig.justice.gov/reports/2015/e1505.pdf.

A number of courts have found that advanced age supports a below guidelines sentence. *See, e.g., United States v. White*, 506 F.3d 635, 647 (8th Cir. 2007) (upholding downward variance for 51-year-old defendant, based in part on age); *United States v. Martinez,* Crim. No. 99-40072, 2007 WL 593629, at *2 (D. Kan. Feb. 21, 2007) (notifying counsel that non-guideline sentence being considered based, in part, on defendant's age, referencing recidivism reports showing increased age and first offender status show decreased likelihood of recidivism); *United States v. Ruiz*, Crim. No. 04-1146-03, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (noting several courts have imposed non-guideline sentences for defendants over 40 based on markedly reduced recidivism, citing recidivism study); *United States v. Cannaday*, No. 08-172, 2009 WL 1587183, at *3 (E.D. Wis. June 5, 2009) (imposing reduced sentence for 46-year-old defendant, citing the Commission's report showing that "recidivism tends to decline among those around defendant's age"); *see also United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (vacating sentence because district court erroneously concluded age, among other factors, could not support downward variance); *cf.* U.S.S.G. § 5H1.1 (age, "individually or in combination with other offender characteristics," may be basis for departure).

**(4)     The Purposes of Sentencing.**

The Sentencing Reform Act requires the Court to impose a sentence that not only will reflect the seriousness of the offense and promote respect for the law, but also will provide just punishment, afford deterrence to criminal conduct, and protect the public from further crimes of the defendant.   Here, the Court can fully achieve these sentencing goals without imposing an

additional term of incarceration, and additional incarceration would be unnecessarily harsh due

to Mr. Ghorbani's age and the circumstances of the offense.

Here, rather than imposing any additional period of incarceration, the Court could

substitute conditions of supervised release.   A sentence of supervised release itself is a

substantial restriction of freedom.   *Gall*, 552 U.S. at 48.   As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more
> severe than probationary sentences of equivalent terms.   Offenders
> on probation are nonetheless subject to several standard conditions
> that substantially restrict their liberty.   *See United States v.*
> *Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497
> (2001) ("Inherent in the very nature of probation is that
> probationers 'do not enjoy the absolute liberty to which every
> citizen is entitled' " (quoting *Griffin v. Wisconsin*, 483 U.S. 868,
> 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))).   Probationers may
> not leave the judicial district, move, or change jobs without
> notifying, and in some cases receiving permission from, their
> probation officer or the court.   They must report regularly to their
> probation officer, permit unannounced visits to their homes, refrain
> from associating with any person convicted of a felony, and refrain
> from excessive drinking. USSG § 5B1.3.   Most probationers are
> also subject to individual "special conditions" imposed by the
> court.

*Id*. at 48-49 (footnote omitted).   In this case, an alternative to an additional term of incarceration

is an appropriate form of punishment in light of Mr. Ghorbani's background, age, and health.

**(5)   The Need to Avoid Unwarranted Disparities.**

Not all disparities in sentencing are prohibited – only *unwarranted* disparities.   *See* 18

U.S.C. § 3553(a)(6).   Here, a consideration of the § 3553 factors demonstrates that in this case, a

sentence below the range is appropriate.   The circumstances of other cases in which U.S.S.G. §

2M5.1 was applied, and a sentence within the range was imposed, do not compare to the

circumstances of the instant offense.   *See, e.g.*, *Vasquez*, 745 Fed. Appx. at 322-23 (defendant

who entered guilty plea to participating in weapons smuggling scheme sentenced to 46 months);
*Kuyumcu*, No. 16-cr-308 (DLI), 2017 WL 3995576 (defendant who shipped Colbalt Powder with
potential military and nuclear applications to Iran and continued to attempt to do business with
Iran sentenced to 57 months); *McKeeve*, 131 F.3d at 14-15 (defendant who violated expert
controls by selling computer equipment to Libya and obstructed justice by committing perjury
when testifying at his trial sentenced to 51 months).

Here, the photographs and information at issue related to public events and individuals
known to support the MEK.   These factors, along with the factors discussed above, demonstrate
that a variance is appropriate here.   No *unwarranted* disparity would result from such a
variance.

Moreover, sentences below the applicable range are common in cases applying § 2M5.1.
*See United States v. Groos*, 2008 WL 5387852 (N.D. Ill. 2008) (corporate executive who sent
sprinkler equipment to Iranian company in violation of IEEPA sentenced to two months); *United
States v. Sevilla*, No. 04 CR 171, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) (defendant who
attempted to evade export controls by sending a hydraulic floor model testing machine to Iran
sentenced to five years probation).   The Court in *Gross* noted that "courts generally do not
impose harsh punishment on embargo crimes that involve non-military goods."   *Gross*, 2008
WL 5387852 *8.   The *Gross* court referenced numerous similar cases.   *Id.* at n.10 (citing
*United States v. Angehr,* No. 08 CR 0003 (E.D. La., filed Jan. 4, 2008) (sentenced for violation
of the IEEPA for exports of computer software to Iran to five years probation, four to six months
confinement to a halfway house, and a $250,000 fine plus forfeiture); *United States v. Freyer,*
No. 06 CR 891 (C.D. Cal., filed Dec. 1, 2006) (sentenced for violations of the IEEPA for

exporting petrochemical valves to Iran and Iraq via Australia to three years probation, six months of home detention, 240 hours of community service, and a $5,000 fine plus costs for the co-defendant who pled guilty and to seventeen months of imprisonment and two years of supervised release for the co-defendant did *not* plead guilty); *United States v. Ghashim,* No. 06 CR 283 (S.D. Tex., filed Aug. 14, 2006) (sentenced for violations of the IEEPA for exports of computers to Syria via the UAE to three years probation); *United States v. Khan,* No. 04 CR 441 (E.D.N.Y., filed May 5, 2004) (sentenced for violations of the IEEPA for exports of aircraft parts to Iran to five years probation, 300 hours of community service, $100,000 fine plus forfeiture); *United States v. Rezaei,* No. 07 CR 380 (N.D. Ga., filed Nov. 14, 2007) (sentenced for violations of the IEEPA for exporting computers to Iran to an unspecified amount of time served, three years of supervised release and forfeiture); *United States v. Mahmood,* No. 04 CR 365 (D.D.C., filed Aug. 10, 2004) (sentenced for violations of the EAR for exporting lift truck parts to Iran via the UAE to time served, seventeen months, and two years supervised release)).

Mr. Ghorbani did not act – and is not being sentenced for acting – as an agent of a foreign government.   Nevertheless, a sentence of 19 ½ months in this case also would be proportional compared to sentences imposed on defendants who have entered guilty pleas to acting as agents of foreign governments.   *See United States v. Kun Shan Chun*, 16-cr-518 (VM) (S.D.N.Y.); *United States v. Ghazi Al-Awadi*, 07-cr-20314 (DT) (E.D. Mich.).   Mr. Chun was an FBI technician with top secret security clearance who provided sensitive, although unclassified, information to Chinese officials over the course of multiple years, causing significant harm to U.S. national security interest.   *Chun*, 16-cr-518 (VM) (S.D.N.Y.), ECF No. 13 (Gov't Sent.

Memo.) (Jan. 6, 2017) (noting defendant attempted to cooperate but was found not credible). He was sentenced to 24 months.

Mr. Al-Awadi had a prior criminal record (include a manslaughter conviction) placing him in criminal history category III, but he was sentenced to just 18 months.   *Al-Awadi*, 07-cr-20314 (DT) (E.D. Mich.), ECF No. 20 (Gov't Sent. Memo.) (Dec. 7, 2007).   The government requested a 51-month sentence because over the course of at least five years, he supplied Saddam Hussein's Iraqi regime with information regarding Iraqi expatriates in the United States.   *Id.* Even if the worst of the government's allegations here were true, Mr. Ghorbani's conduct did not rise to the level of Mr. Al-Awadi's conduct.   Moreover, Mr. Ghorbani does not have a criminal record as Mr. Al-Awadi did, but like Mr. Al-Awadi, Mr. Ghorbani is older with significant health issues.   The sentence of time served requested by Mr. Ghorbani is greater than the sentenced imposed on Mr. Al-Awadi.   Given the comparisons, imposing a sentence of more than time served here would constitute an unwarranted disparity and fail to promote respect for the law.

## <u>Conclusion</u>

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Ghorbani respectfully moves this Honorable Court to vary from the applicable Guidelines sentencing range and impose a sentence of time served (the equivalent of a 19 ½ month sentence) to be followed by a term of supervised release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


        /s/
_____

MARY MANNING PETRAS
EUGENE OHM
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.   20004
(202) 208-7500 ext. 109