**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. 18-255 (PLF) |
| | ) | |
| AHMADREZA DOOSTDAR, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT AHMADREZA DOOSTDAR'S RESPONSE
TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

At the outset of their initial sentencing memorandum counsel suggested the danger of mixing politics with the criminal justice system. The government's over-the-top recommendation for Doostdar to the high-end of an inapplicable federal sentencing guideline range, based in large part on a dubious expert declaration that rests on highly speculative and inappropriate conclusions, describes conduct that is not present in this case, and ultimately poses the very real risk of doing precisely what counsel warned about in their Sentencing Memorandum—sentencing Doostdar as a proxy for Iran at a time of tense geopolitical conflict, rather than for conduct he himself is responsible. While the Trump Administration's Justice Department would no doubt prefer that wrongheaded political outcome, Article III and its Federal Courts must continue to safeguard against a descent into specialized national security tribunals that are set aside for perceived political opponents. In plain point of fact, which the prosecutors do not have the candor to admit directly, the government has no evidence whatsoever that Doostdar had any idea what use the government of Iran was going to make of the innocuous information he passed on after obtaining it from Ghorbani. Instead, one has to parse the language of the government's pleading carefully to realize this is, in fact, the case based upon its own evidence—or lack thereof.

Complicating matters worse, Ghorbani, in an apparent attempt to save himself from the immigration consequences of an aggravated felony and exclusion from the United States, now claims he was really a supporter of the MEK and was not acting as an agent of the government of Iran.  So much for the conspiracy!  Worse yet, based upon this tactical move and Ghorbani's agreement to the IEEPA guidelines, Doostdar finds himself in a higher range than even Ghorbani if the government has its way.

As the Court may recall at the time of Doostdar's guilty plea, counsel mentioned that this was a case that might have been better going to trial in light of the very triable nature of this case from the defense perspective; but that it was Doostdar's desire to return home as quickly as possible so as to reunite with his family and young daughter who was born in his absence.  After reviewing the government's pleading and its recommendation, based almost entirely on the the ridiculously speculative declaration of its espionage "expert," counsel truly regret not trying this case.  Doostdar, as he admits, was acting as an agent of Iran in a technical sense, but he was not in any way shape or form putting the lives of Americans or MEK members at risk.  To sentence him as such on the basis of this record would be a travesty of justice that should permit him to consider withdrawing his guilty plea.[1]

---

[1] Counsel do not make this statement lightly; and to be clear, this is the statement of counsel not Doostdar who fully accepts responsibility for what he did and continues to do so. But to permit a declaration of this so-called expert into evidence based upon the loose rules of sentencing procedure to enhance Doostdar's sentence is simply wrong and will be addressed more fully herein. Counsel have a privileged call with Doostdar at 2:00 PM CST this afternoon, three hours after the filing deadline for this reply.  Counsel will discuss this and other issues with him this afternoon, although Doostdar has still to receive the sentencing pleadings at the Piedmont Regional Jail that were sent him the day counsel received them.  As such, counsel may request a continuance of Doostdar's sentencing for another week or two, and will so apprise the Court.

## ARGUMENT

### A. The Court Should Give No Weight, to the Declaration of Robert Anderson, Jr., When Determining Doostdar's Sentence.

The government devotes much of its sentencing memorandum to highlighting the declaration of Robert Anderson, Jr., a recently retired FBI Special Agent who has entered the private sector and, apparently, just started to work as an expert witness. (Dkt. #109-2).[2]  Much of Anderson's declaration focuses on what he perceives to be conduct consistent with "tradecraft" associated with an intelligence service, which again merely reaffirms the FBI's own self-serving determinations. (*See, e.g.*, Dkt. #109-2, ¶¶ 13-23).[3]  However, the fact of the matter is that Doostdar has pled guilty, pursuant to a plea agreement, to violating 18 U.S.C. §951 by acting as an agent of a foreign government.  He has accepted responsibility for the offense. Much of Anderson's declaration seems as if it were prepared for trial on the issue of whether Doostdar violated §951.  From that perspective, dwelling on Anderson's friendly interpretation of the FBI's investigation serves little utility at this point.[4]

---

[2] Anderson's prior experience as an expert is limited to "two civil litigation depositions" where his testimony concerned "cyber security and intrusions by nation-state actors." (Dkt. #109-2, ¶1).  He has offered only one prior declaration in a criminal case, that of *United States v. Butina*, No. 18-cr-218 (D.D.C.), which was prosecuted by the same office. (*Id.*).

[3] As an initial point, Anderson's declaration appears in large part to be a ratification of the Criminal Complaint drafted by his former FBI colleagues, with whom he admittedly consulted in the drafting of the declaration.  He even adopts specific language in the complaint, such as that Iran sees the MEK as its "primary opponent" and seeks to "eradicate" it.  (*Compare* Anderson Declaration, Dkt. #109-2, ¶¶ 3, 4, and 8 *with* Criminal Complaint, ¶10 ("The Government of Iran considers the MEK to be a primary opponent of the current regime, and has sought to eradicate the MEK.")).  The description of "targeting packages" also overlaps significantly.  (*Compare* Anderson Declaration, Dkt. #109-2, ¶ 8 *with* Criminal Complaint, ¶ 6).  Anderson also includes a paragraph describing Iran's "hostile stance toward Israeli and Jewish interests across the globe" (Dkt. #102-2, ¶7), which echoes the allegations in the Criminal Complaint that are not part of the plea.  Those assertions in the declaration have no bearing or relevance in the sentencing of Doostdar and must be disregarded.

[4] Still, the fact that Doostdar has pled guilty does not mean that Anderson's conclusions must be accepted. Counsel cannot help but note that many of Anderson's conclusions appear to be based on self-fulfilling

Anderson's declaration appears to be primarily intended to serve as support for the government's investigation and its argument that lengthy sentences are warranted because of the aggravated nature of the offense.  (*E.g.*, Dkt. #109, pp. 24-25).  But to reach the conclusion that any conduct of Doostdar would—much less could—result in any harm or violence goes too far even based on Anderson's declaration.  At best, he concludes that the information involved in the case is the "type of information that an Iranian intelligence service would use for *additional research* and to populate an *eventual targeting package*."  (Dkt. #109-2, ¶11) (emphasis added).  Thus, Anderson opines that the information collected by Doostdar should not be seen as a final product by any stretch of the imagination, but one small piece that might possibly be incorporated into a larger portfolio of information.  Indeed, Anderson claims that an "effective agent will also collect information about the target's personal life and character, such as the target's family and social ties, likes and dislikes, habits, ideological leanings, character flaws, vices, and any other information that might make the target amenable to recruitment."  (Dkt. #109-2, ¶8).  The limited information in the photographs at Government Exhibit 6 can hardly be said to the be the products of an "effective agent" even by Anderson's definition.

Moreover, Anderson fails to explain how the precise conduct in this case could result in

---

prophecies where everything Doostdar did is interpreted to be evidence of tradecraft rather than alternative, even more reasonable explanations.  Cutting through a parking lot and looking in car windows is seen as attempting to determine if he was being audio or video recorded, as opposed to taking the shortest route. (Dkt. #102-2, ¶17).  Taking different bus lines to the beach and then taking photographs of the ocean becomes a "common tradecraft practice" of determining if one is being followed and then seeing if one was being surveilled rather than merely taking the bus and necessary bus transfers to go to the beach when one does not have an international driver's license.  (Dkt. #102-2, ¶18).  And taking photographs of the beach is simply what one does at the beach.  Walking slowly and looking at one's surroundings is not necessarily because of countersurveillance efforts, but instead because Doostdar is a rather large man and not the most coordinated. (Dkt. #109, p. 4).  Doostdar brought an old phone for his July 2018 trip because his other phone had been stolen in Iran, not for "operational security reasons." (Dkt. #109-2, ¶22).  The list of alternative inferences and conclusions could go on and on.

"kinetic attacks" or is of "tremendous intelligence value" for Iran (as opposed to his perspective as a former FBI agent). He does not discuss how these particular photographs taken of individuals at a highly publicized gathering aggravate the offense in any meaningful way. Nor could he.

Indeed, neither Anderson nor the government can point to any evidence indicating that Doostdar knew or intended that his conduct could lead to violence or "targeting;" and counsel believe the government must and will so concede. Instead, Anderson and the government rely cite prior incidents involving the MEK, including from the 1990s in Europe, from 2015 in Iraq where the MEK were then based, and also from July 2018 in Paris. (Dkt. #102, pp. 6-7, footnote 5; #109-2, ¶¶4-6). Yet, neither Anderson nor the government claim that any of those prior incidents involved conduct similar to the specific offense conduct at issue here. Neither the evidence in this case nor Anderson's declaration itself supports the government's assertion that "it is entirely possible that Iran would try to act on the information the defendants provided in a similar way in this country" by conducting physical attacks on individuals (Dkt. #109, p. 19, citing Anderson Declaration at 3-4).

Regardless, and without commenting on any of the specific incidents cited in Anderson's declaration, the fact that Iran views the MEK has a hostile, terrorist threat is not news. The MEK was, of course, listed by the United States as a terrorist organization until it was delisted in 2012 after intense and controversial lobbying efforts. (*See* Sentencing Memo, Dkt. #105, pp. 7-11). Indeed, something the government will not want to bring up, in a very recent diplomatic cable to calm tensions over the Trump Administration's assassination of Qassem Soleimani, on January 8, 2020, Secretary of State Pompeo ordered diplomats not to meet with Iranian opposition

groups, including the MEK, because many of those groups "'have previously or are currently using violent means in support of their political aims.'"[5]  These shifting sands of geopolitical intrigue should serve to highlight the very dangerousness of the government's position in this case.  One day the MEK is a terrorist organization, another it is not.  One day the MEK is our foreign policy ally, the next day it is not. The only thing certain is that this, too, will change.

### B.  The Court Should Not Use the IEEPA Guidelines to Determine Doostdar's Sentence.

As set forth in the plea agreement, "the parties agree that the U.S.S.G. does not specify a Guidelines range for a violation of 18 U.S.C. §951."  (Dkt. #75, p. 3).  (*Id.* "Here, the U.S.S.G. does not specify a Guidelines range for the underlying substantive offense.").  In its sentencing memorandum, the government agrees with the Probation Officers that "there is no analogous guideline here." (Dkt. #109, p. 16).  Yet, the government nevertheless deviates from the PSR (despite having filed no objections to which the defense could have responded) and now asserts that the Court should use the guidelines applicable to the IEEPA violation to which Ghorbani pled, *i.e.*, U.S.S.G. § 2M5.1.  The government takes this position because of the "overlapping and similar nature of the criminal conduct of the two defendants."  (Dkt. #109, p. 16).  This

---

[5] Kylie Atwood, *Pompeo orders diplomats not to meet with Iranian opposition groups amid tensions*, CNN, Jan. 8, 2020 (available at: https://cnn.it/2tbTE9s) (last visited Jan. 12, 2020); Nick Wadhams, *Pompeo Limits U.S. Links to Iranian Group Linked to Giuliani*, Bloomberg, Jan. 7, 2020 (available at: https://bloom.bg/2NkNz1s) (last visited Jan. 12, 2020) (quoting the cable: "'Direct U.S. government engagement with these groups could prove counterproductive to our policy goal of seeking a comprehensive deal with the Iranian regime that addresses its destabilizing behavior," the cable said. Exiled Iranian opposition groups 'try to engage U.S. officials regularly to gain at least the appearance of tacit support and enhance their visibility and clout.'") And, as we all know, the MEK has engaged none other than President Trump's personal lawyer, and ersatz cabinet member, Rudy Giuliani.  Thus, the prosecutors' crocodile tears over the MEK should be seen as just that and nothing more.

position, asserted for the first time in the sentencing memorandum, should be rejected out of hand.

It is entirely unfair to Doostdar for the Court to use the guidelines applicable to a completely different offense that the government has agreed to dismiss at sentencing. (Dkt. #75, p. 2). Those guidelines are only at issue because Ghorbani elected to plead to an IEEPA count, rather than the §951 charge, ostensibly as part of a strategy to try and avoid immigration consequences. Put simply, Doostdar's sentence should not be determined by Ghorbani's tactical decision regarding potential collateral consequences. The government's attempt to apply the IEEPA guidelines for a §951 violation is not only inconsistent with its prior position that there are no applicable or analogous guidelines, but it also departs from its position in other §951 cases, as recently as the widely publicized case of *United States v. Butina*, brought by the very same office. *See* Case No. 18 CR 218, Dkt. #99, p. 12 ("The government also agrees with the Presentence Report that there is no sufficiently analogous Guideline for the conduct at issue here."). *Id.*, p. 13 ("The majority of courts that have looked at the issue of what Guideline range to apply to violations of 18 U.S.C. § 951 have determined that there is no sufficiently analogous Guideline."). Nor does the government cite as authority any other case that adopts the IEEPA guidelines in a §951 case. Rather, the government's argument appears to be based merely on the "similarity in the underlying conduct," similarity that even Ghorbani now appears to deny. That is simply an insufficient justification for the government's request, and certainly not a reason to deviate from the guidelines, which succinctly provide: "If there is not a sufficiently analogous

guideline, the provisions of 18 U.S.C. §3553 *shall control*."   U.S.S.G.   §2X5.1 (emphasis

added).[6]

### C.  The Court Should Impose a Sentence Between 18-24 Months, as it is Sufficient, But Not Greater Than Necessary Under All of the §3553(a) Factors.

The government cites several cases involving convictions and sentences for violations of

§951.  Rather than support its recommendation for a sentence at or near 71 months, these cases

show that Doostdar's recommendation for a sentence between 18-24 months is far more

reasonable and consistent with §3553(a).  That range is set by the *Souied* and *Al-Awadi* cases on

the one end, and the *Butina* case on the other end.

Not one of the government's cases involves a sentence at or near 71 months, despite

involving conduct that is far more serious than that involved here.  Defendants in several of the

government's cases received far less than 71 months even *after trial*, in contrast to Doostdar who

has timely pled and accepted responsibility.  *See United States v. Dumeisi*, No. 03 CR 664 (N.D.

Ill.) (defendant who was an agent of the Iraqi intelligence service while Iraq is designated as a

state sponsor of terrorism and provided information on dissidents to Iraq is sentenced to 46

months after trial); *United States v. Latchin*, No. 04 CR 661 (N.D. Ill.) ("sleeper agent" who

---

[6] The government also argues that, "Although U.S.S.G. § 2M5.1 does not apply to Doostdar, that Guideline should inform the Court's assessment of the seriousness of Doostdar's conduct vis-à-vis other defendants convicted of violating 18 U.S.C. §951." (Dkt. #109, pp. 21-22).  However, if that position had merit, then the guideline commentary would surely encourage sentencing courts to adopt that analysis. Further, even under the government's flawed analysis, the IEEPA cases cited in its memorandum fall far short of the 71-month sentence that it seeks.  *See* Dkt. #109, pp. 25 (citing IEEPA cases resulting in sentences of 36 months, 48 months, and 46 months).  It should also be noted that a number of IEEPA cases—even involving export violations *to Iran*—have resulted in sentences far less than those cited by the government.  *See, e.g., United States v. Behroozian* (2:16 CR 00185) (S.D. Ohio) (defendant who exported dual use mechanical products to Iran sentenced to 20 months); *United States v. Biria* (1:18 CR 00163) (N.D. N.Y.) (defendant who exported gas turbine parts to Iran sentenced to 21 months); *United States v. Ghodskani* (15 CR 329) (D. Minn) (defendant who conspired to export controlled technology to Iran sentenced to 27 months).

acted on behalf of Iraqi intelligence service while Iraq is designated as a state sponsor of terrorism is sentenced to 48 months after trial); *United States v. Duran*, 07 CR 20999 (S.D. Fla.) (defendant sentenced to 48 months after trial).

In *United States v. Carlos Alvarez*, 05 CR 20943 (S.D. Fla), the defendant was sentenced to 60 months in prison after he admitted he acted as an unregistered agent for Cuba for over 30 years and passed on information about dissidents to Cuban intelligence while Cuba was designated as a state sponsor of terrorism.[7]  Regarding the offense conduct here, it must be noted that while the conspiracy as charged ran from March 2017 through August 2018, Doostdar was in the United States in 2017 for less than 20 days.[8]  Further, it does not minimize the seriousness of the offense to focus on the fact that the photographs and notes that Doostdar gathered from Ghorbani were of a public protest and gathering that was meant to get the attention of others, including those in Iran.  Individuals present at that gathering included well-known MEK supporters who no doubt continue to appear publicly at MEK rallies.  It must also be noted—as a necessary counterbalance to the government's request for a lengthy sentence based on the potential for violence—that law enforcement intentionally permitted these photographs to leave the country in December 2017.  Rather prevent the photographs from leaving the country, law enforcement instead photographed them and then allowed Doostdar to return to Iran with them.

---

[7] With respect to the government's effort to apply the IEEPA guideline, is noteworthy how in *Alvarez*, the government strenuously objected the defendant's argument that U.S.S.G. §2M3.3 applied.  In a sentencing pleading, the government wrote as follows: "As an initial matter, Carlos Alvarez's argument that he should be sentenced pursuant toU.S.S.G. §2M3.3 is without merit. There is simply no analogous guideline provision for 18 U.S.C.§ 951(a)."  *United States v. Alvarez*, 1:05 CR 20943, Dkt. #228-1, p. 6.

[8] For the July 2017 trip, Doostdar was in Chicago from July 19-25 and then in California from July 25-29, 2017.  And for the December 2017 trip, Doostdar was in Chicago from December 4-9, 2017, and then in California from December 9-12, 2017.  Doostdar returned to Chicago on July 19, 2018, and stayed there until his arrest on August 9, 2018.  He made several attempts to call Ghorbani, but never spoke with him, much less met with him.

Other cases cited by the government—which involve sentences of 30 and 24 months (Dkt. #109, p. 29)—simply do not come close to the 71 months it requests for Doostdar. In short, the government's cases completely fail to "demonstrate that the government's recommendation" of the "high end" of the 57-71 month range are "squarely within the heartland of similar cases," as the government contends they do. (Dkt. p. 30).

Doostdar has discussed at length the most analogous cases—*Souied*, *Al-Awadi*, and *Butina*—and has explained how they inform the requested range of 18-24 months. (Dkt. #105, pp. 23-28). The government does not mention *Souied* and relegates *Al-Awadi* to a footnote. (Dkt. #109, p. 28, footnote 10). While the government cites the *Butina* case resulting in a sentence of 18 months after it moved for a downward departure reflecting the defendant's cooperation, it neglects to add how it also wrote that "an appropriate sentence in this case prior to taking the defendant's cooperation into account is 24 months' incarceration." (Case No. 18 CR 218, Dkt. #99, p. 1). As noted in Doostdar's sentencing memorandum, the offense conduct in the *Butina* case involved two years of the defendant attempting to establish unofficial lines of communication between Russia and Americans in a position to impact U.S. politics in order to gain influence over the U.S. presidential administration. (Dkt. #105, pp. 27).

Lastly, the government's memorandum provides examples why Doostdar should not receive an aggravated role in the offense relative to Ghorbani. The bullet-point summary of communications that Doostdar received clearly show that Doostdar received direction from another and that he merely followed those directions without exercising independent discretion or supervisory authority over Ghorbani. (Dkt. #109, pp. 5-6). The government's memorandum also indicates how Ghorbani attended the September 2017 and May 2018 rallies without any

instruction, guidance, or direction from Doostdar.  (Dkt. #109, pp. 6, 11-12).  Ghorbani also travelled to Iran and returned with what the government portrays as a "list of taskings" that did not come from Doostdar.  (Dkt. #109, p. 11).  For the additional reasons set forth in Doostdar's Sentencing Memorandum, the evidence does not support an aggravated role for Doostdar compared to Ghorbani, but rather shows that each defendant had separate roles.

## **CONCLUSION**

For the reasons set forth above and in Doostdar's Sentencing Memorandum, counsel again respectfully request that the Court impose a sentence between 18-24 months.

Respectfully submitted,

/s/Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**.

**DURKIN & ROBERTS**
515 W. Arlington Place
Chicago, Illinois 60614
(312) 913-9300
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

11

## **CERTIFICATE OF SERVICE**

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant's Response to the Government's Sentencing Memorandum was filed on January 13, 2020, through the Court's Electronic Case Filing (ECF) system and thereby delivered to all counsel of record.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**.
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com